In the Interest of A.E., J.E., S.E., and X.E., Minor Children.

Northern Arapahoe Tribe, Appellant,

R.E., Mother, Appellant.

No. 97–829.

Supreme Court of Iowa.

Dec. 24, 1997.

Todd E. Babich of Babich, McConnell & Renzo, Des Moines, for appellant–Tribe.

Frank Steinbach III of Cook, Gotsdiner, McEnroe & McCarthy, Des Moines, for appellant–mother.

Thomas J. Miller, Attorney General, and Chris Odell, Assistant Attorney General, for appellee–State.

Mike Bandstra, Des Moines, guardian ad litem for minor children.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO, and ANDREASEN, JJ.

LAVORATO, Justice.

In this juvenile proceeding regarding temporary placement of four Indian children, we must decide two questions involving the Indian Child Welfare Act (ICWA). First, did the juvenile court correctly deny a motion to transfer jurisdiction of the proceedings to a tribal children's court in Wyoming? Second, did the juvenile court have good cause to deviate from placement preferences under the ICWA when the court placed temporary custody with the father's girlfriend?

Finding that the district court acted correctly in both instances, we affirm the temporary custody placement.

I. *Background Facts and Proceedings.*

Four children are the subject of these proceedings. For the purposes of this opinion we refer to them as Anne, Sam, Jamie, and Xander. Anne is twelve; Sam is ten; Jamie is eight; and Xander is six. All four children are enrolled members of the Northern Arapahoe Tribe (Tribe), each possessing ¼ degree of Indian blood. All four lived with their mother at the Wind River Reservation at Fort Washakie, Wyoming from 1990–1994. Otherwise, they have had no contact with the Tribe, the reservation, or any member of the Tribe or their extended family.

We refer to the children's mother as Reba. By her own admission, Reba has an addiction to cocaine and marijuana. Reba admits she cannot care for her children. Reba is a member of the Tribe, and she possesses ½ degree of Indian blood. She has several uncles, aunts, and cousins still living at the reservation.

The children's father, whom we refer to as Andrew, is not Indian. Like his wife, Andrew has a drug addiction and has committed acts of physical abuse against his present girlfriend, Sharon, and his son, Xander.

Ida and Leo Monroe are Reba's aunt and uncle, who live on the Wind River Reservation. According to Reba, Ida and Leo have agreed to take custody of all four children. No one else could confirm this, including the Tribe. The Monroes have not contacted the social worker in this case, Tracey Parker. Nothing is known about the Monroes.

Sharon is the mother of one of Andrew's children (not one of the children who are the subject of these proceedings). Sharon has seven children, including the four in interest here, living with her in a two-bedroom home. According to one family counselor's testimony, she cares well for the children. Under Sharon's care, the four children in interest are happy, call her "mother," have bonded with her, and are doing well academically. Sharon, however, does need help. She becomes frustrated and requires assistance with the children.

The case started in January 1995, when all of the children in interest, except Sam, tested positive for cocaine. Their mother, Reba, tested positive for cocaine and marijuana. The State brought a child in need of assistance action on all four children, and, following a hearing, district judge Donna L. Paulsen adjudicated the children "in need of assistance" on March 13. *See* Iowa Code § 232.2(6)(c)(2), (6)(n), and 6(o) (1995). The parties stipulated at this hearing that the court should allow the Tribe to intervene in the proceedings. This stipulation was later confirmed in a nunc pro tunc order entered May 1, 1995.

The March 13 order continued the custody of the children in the father, directed the father to complete a substance abuse evaluation and to follow through with recommendations. The order also directed the father to show he was no longer ingesting controlled substances by providing urine samples for analysis (commonly-called UAs) at the request of the Iowa Department of Human Services. Finally, the order allowed the mother supervised visitation at the discretion of the Department only after providing two clean "UAs."

On May 1, juvenile court judge Karla J. Fultz confirmed the March 13 order and placed temporary legal custody of the four

with their father, Andrew. Andrew's custody of the children was short-lived. He failed to provide weekly urine samples for drug-testing, would not cooperate with an in-home social worker, tested positive for marijuana use, and would not participate in several court-ordered drug treatment programs. In addition, Andrew physically abused Xander and Sharon. He was compelled to leave the home under a domestic abuse no-contact order.

On March 21, 1997, two years and several hearings later, the juvenile court in a temporary, emergency order placed the children in Sharon's custody "pending further hearing and orders which are anticipated in the near future."

On April 8 the Tribe filed a motion to transfer the proceedings to the Shoshone and Arapahoe Tribal Children's Court of the Wind River Indian Reservation, Fort Washakie, Wyoming pursuant to the ICWA. In the alternative, the Tribe asked the court to place the children with a member of the children's extended family or a foster home licensed, approved, or specified by the Tribe pursuant to the ICWA. Reba joined in the Tribe's motion, but Andrew filed a response in which he stated that he "was not in agreement with" the Tribe's motion. In addition, Andrew expressly stated in his response that he did not give his consent to the requested transfer of jurisdiction. The children's guardian ad litem also resisted the Tribe's motion.

The juvenile court then held a hearing at which Reba and three social workers testified. Following the hearing, the court entered an order denying the Tribe's motion and continuing temporary legal custody with Sharon.

It is from this order that the Tribe and Reba appeal. Reba joins in the Tribe's brief.

The State joins the brief of the guardian ad litem. The State filed a supplemental brief on the transfer of jurisdiction issue.

The Tribe raises two issues. First, it contends the juvenile court should have transferred jurisdiction of the proceedings as it requested. Second, the Tribe contends the court should not have placed custody with Sharon. Rather, the Tribe further contends, the court should have placed such custody with the children's extended family or a foster home licensed and approved by the Tribe.

## II. *Scope of Review.*

■ Our review in child in need of assistance proceedings is de novo. *In re J.R.H.*, 358 N.W.2d 311, 317 (Iowa 1984). Where, as here, the children are members of a U.S. Indian tribe, the provisions of Iowa Code chapter 232 governing children in need of assistance are modified by the ICWA. *In re J.W.*, 528 N.W.2d 657, 659 (Iowa App.1995).

## III. *The ICWA.*

Congress enacted the ICWA in 1978 because of a

> rising concern in the mid–1970s over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.

*Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 32, 109 S.Ct. 1597, 1599–600, 104 L.Ed.2d 29, 36 (1989). In § 1901 of the ICWA, Congress made the following findings:

> (1) that clause 3, section 8, article I of the United States Constitution provides that "The Congress shall have Power ... To regulate Commerce ... with Indian tribes" and, through this and other constitutional authority, Congress has plenary power over Indian affairs;

> (2) that Congress, through statutes, treaties, and the general course of dealing with Indian tribes, has assumed the responsibility for the protection and preservation of Indian tribes and their resources;

> (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes, than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

(4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and

(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901.

In § 1902 of the ICWA, Congress declared that it is the policy of this Nation to protect the best interest of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster and adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

*Id.* § 1902.

IV. *Transfer of Jurisdiction to the Tribe.*

■ In § 1903(4) of the ICWA, an "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4). It is uncontroverted that the four children meet this definition.

The ICWA defines a child custody proceeding to mean

any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated.

*Id.* § 1903(1)(i). The parties concede placement of the children with Sharon is a "temporary placement in a foster home" and otherwise meets the definition of "child custody proceeding" in this section.

The ICWA grants the Indian child's tribe the right to intervene at any point of a State court proceeding for the foster care placement of an Indian child. *Id.* § 1911(c). The Tribe has intervened in these proceedings.

The ICWA provides that

[i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, *absent objection by either parent,* upon the petition of either parent or the Indian custodian or the Indian child's tribe. . . .

*Id.* § 1911(b) (emphasis added). It was under this provision that the Tribe moved to transfer jurisdiction of these proceedings to its tribal court in Wyoming. The parties considered the juvenile court's order placing temporary custody in Sharon as a foster care placement. The order therefore triggered the provisions of section 1911(b).

The language "absent objection by either parent" gives either parent veto power over the transfer. Here Andrew, the father, expressly refused to consent to the transfer. Contrary to the Tribe's contention, no authority exists supporting its claim that a parent loses his or her right to object through misconduct. Regardless of Andrew's conduct, he still retained veto power. Because Andrew objected, the juvenile court correctly refused to transfer jurisdiction.

V. *The Foster Care Placement.*

Placing custody with Sharon presents a more difficult problem. Section 1915(b) of the ICWA provides the following preferences for foster care placement:

Any child accepted for foster care . . . shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be

met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care ... placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

(i) a member of the Indian child's extended family;

(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

*Id.* § 1915(b).

Relative to these placement preferences, the juvenile court made the following findings:

The placement of the children with Sharon Wright, mother of their half sibling, and father's significant other, who has been in the role of stepmother is in the children's best interest and *appears to qualify as placement with the children's extended family as set out in the guidelines for placement under the Indian Child Welfare Act.*

(Emphasis added.) Thus, it is apparent that the court relied in part on the extended family preference of 1915(b) in placing custody of the four children with Sharon. *See id.* § 1915(b)(i).

The ICWA defines "extended family member" to include, among others, a stepparent. *Id.* § 1903(2). The ICWA does not define "stepparent." We therefore turn to the common meaning of the word, which is "the husband or wife of one's mother or father by a subsequent marriage." Webster's Third New International Dictionary 2237 (1993). Contrary to the court's finding, Sharon is not a stepparent within the meaning of § 1903(2). She is therefore not "a member of the Indian child's extended family" because she is not married to Andrew, the children's biological father. As the court found, Sharon is Andrew's significant other.

Sharon is therefore not a preferred placement for the purposes of the ICWA.

This, however, does not end our inquiry. By its own terms, § 1915(b) allows a State court to deviate from the list of preferred placements in § 1915(b) if "good cause" exists for such deviation. *Id.* § 1915(b). The ICWA neither defines "good cause" nor describes the factors a state court may consider in determining whether it exists.

At least two appellate courts that have interpreted the "good cause" exception of § 1915(b) allow trial courts the discretion to consider the best interests of the child as one of the factors in determining whether the exception applies. *See In re Adoption of F.H.,* 851 P.2d 1361, 1363–64 (Alaska 1993); *In re Adoption of M.,* 66 Wash.App. 475, 832 P.2d 518, 522 (1992). In *In re F.H.,* the Alaska Supreme Court held:

Whether there is good cause to deviate [from the § 1915(b) preferences] depends on many factors including, but not necessarily limited to, the best interests of the child, the wishes of the biological parents, the suitability of persons for placement and the child's ties to the tribe.

851 P.2d at 1363–64.

In the same vein, the Washington Court of Appeals held:

Good cause is a matter of discretion, and discretion must be exercised in light of many factors. These include but are not necessarily limited to the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement, the child's ties to the tribe, and the child's ability to make any cultural adjustments necessitated by a particular placement.

*In re M.,* 832 P.2d at 522 (citations omitted).

Two other courts take the position that the best interests of the child standard is not appropriate for determining the good cause exception in § 1915(b). *See In re Custody of S.E.G.,* 521 N.W.2d 357, 361–62 (Minn.1994); *In re Adoption of Riffle,* 277 Mont. 388, 922 P.2d 510, 514 (1996). In *In re S.E.G.,* the Minnesota Supreme Court determined that simply applying a best interests standard was contrary to the plain language of the

ICWA read as a whole and its legislative history. Such language and history

clearly indicate the state courts are a part of the problem the ICWA was intended to remedy.... The best interests of the child standard, by its very nature, requires a subjective evaluation of a multitude of factors, many, if not all of which are imbued with the values of majority culture. It therefore seems "most improbable" that Congress intended to allow state courts to find good cause whenever they determined that a placement outside the preferences of § 1915 was in the Indian child's best interests.

*In re S.E.G.*, 521 N.W.2d at 362–63 (citations omitted).

The court went on:

Though the BIA [Bureau of Indian Affairs] guidelines are not binding on the courts, the use of the word "shall" in § F.3(a) strongly suggests that a consideration of whether good cause exists should be limited to the factors described in the guidelines. [Guidelines for State Courts; Indian Child Custody Proceedings], 44 Fed.Reg. 67,584, 67,594 (1979). We hold, therefore, that a determination that good cause exists to avoid the placement preferences of § 1915 should be based upon a finding of one or more of the factors described in the guidelines.

*Id.* at 363.

Section F.3 of the BIA guidelines referred to in *In re S.E.G.* describes circumstances which provide "good cause" to modify the placement preferences of § 1915(b):

F.3. Good Cause To Modify Preferences

(a) For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference set out [in § 1915(b)] shall be based on one or more of the following considerations:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.

(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

(b) The burden of establishing the existence of good cause not to follow the order of preferences established in subsection (b) [of § 1915] shall be on the party urging that the preferences not be followed.

Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584 (1979).

As one can readily see, these guidelines do not include a best interests of the child standard and for that reason are quite restrictive on the question of good cause. According to *In re S.E.G.*, eliminating the best interests standard on the question of good cause ensures "that Indian child welfare determinations are not based on a white, middle class standard which in many cases, forecloses placement with an Indian family." *In re S.E.G.*, 521 N.W.2d at 359 (quoting *Choctaw Indians*, 490 U.S. at 37, 109 S.Ct. at 1602, 104 L.Ed.2d at 39).

Following the lead of *In re S.E.G.*, the Montana Supreme Court similarly held that the best interests standard is an "unnecessary and inappropriate analysis under the ICWA" on the question of good cause to deviate from the § 1915(b) preferences. *In re Riffle*, 922 P.2d at 515. The court made no definitive statement about what constitutes good cause. The court, however, inferentially followed the BIA guidelines in concluding there was no good cause for overcoming the § 1915(b) preferences in upholding placement with the Indian child's uncle, a member of the child's tribe. This is apparent from the following passage in the opinion:

In the present case, the record clearly supports the conclusion that there was no "good cause" for overcoming the placement preferences of the ICWA: the Department had approved [the uncle] as providing an approved adoptive home; [the uncle] is bonded with [the child]; he had significant contact with her during the first 18 months of her life; he is [the child's] uncle and, as such, is part of her extended family; [the child's] natural mother supported [the un-

cle] as the adoptive parent for [the child], and; the Department supports [the uncle] as the adoptive parent for [the child].

*Id.*

■ We favor the position of the Washington and Alaska courts as the sounder approach. We think the "good cause" for deviating from the § 1915(b) preferences depends on a fact determinative analysis consisting of "many factors including, but not necessarily limited to, the best interests of the child, the wishes of the biological parents, the suitability of persons for placement, and the child's ties to the tribe." *In re F.H.*, 851 P.2d at 1363–64. In short, the best interests of the child is but one factor, among many, that the court may consider.

The BIA guidelines contain language that suggests state courts have discretion to include the best interests standard as a factor on the question of good cause. On this point the BIA guidelines provide:

> Primary responsibility for interpreting other language used in the Act, however, rests with the courts that decide Indian child custody cases. *For example, the legislative history of the term "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child.*

Guidelines, 44 Fed.Reg. at 67,584 (emphasis added).

■ In our de novo review of the evidence, we find that good cause exists to deviate from the § 1915(b) preferences by placing the custody of the children with Sharon on a temporary basis. What follows is testimony supporting our conclusion.

As mentioned, three social workers testified. None of their testimony was refuted. One of those testifying, Patricia Kline, is a licensed social worker with a bachelor's and master's degree in that field. She was a clinical social worker at the Pine Ridge Indian Health Clinic in South Dakota for two years and, since then, has worked at the Mental Health Clinic of Tama County. She has worked extensively with Indians in individual, family, and marital counseling. She has testified on behalf of Indian children in placement cases. After testifying that it would be in the children's best interest to be placed temporarily with Sharon, Kline testified further:

> I would recommend temporarily it is better for them to live in a familiar setting where they feel cared for and apparently are well cared for. I would think to make a change at this point in time without any preparation [other] than looking into what types of family situation the children would live in, that would be detrimental to them. In the long run, if there is a need for a more permanent situation, if both parents are unable to care for these children, then I would fully agree that looking into a family relative type of placement and on a reservation would be advisable. I think temporarily it would be detrimental for them to be moved to the reservation at this time, that temporarily they are—I think they should remain where they are.

Craig Bertholf, a family counselor with Youth Homes of Mid–America, testified about the children's current living situation. He testified that he had seen the children in the home at least once a week for the last seven or eight months before the hearing. He further testified the children were happy, well-cared for in Sharon's home, and were doing well academically. Despite becoming frustrated with raising seven children, Sharon displays affection for the children and acts as their "mother." The children regard her as such and have bonded with her. He recommended that if the children were removed from Andrew's custody, that they remain temporarily in Sharon's home.

Tracey Parker, a social worker with the Iowa Department of Human Services also testified she believed the children's best interests would be served by their remaining temporarily with Sharon. Neither she nor Bertholf were able to learn anything substantive about the children's views of the reservation. She told the Tribe's counsel,

> I would have to agree with Ms. Kline that if we are looking for a permanent placement, then the Tribe needs to be considered and I would support that. I have concerns about the temporary nature right now of removing the children from a stable

place, sending them to Wyoming with the idea that they may then have to be brought back to Iowa.

She went on,

I have no idea what the memory or if [the children] have any memory of being on the reservation. That would really need to be explored further with these children to determine if it would be detrimental—to what extent it would be detrimental for them to be returned to the reservation.

In short:

Q. So Miss Parker, what you're saying is, as Miss Kline said, if we're looking at temporary solutions, leave the kids where they are. If we're looking for more permanent time solutions, consider the Tribe? A. At this point that would be correct.

Reba had a different view. She testified that she wished the children to go to the reservation now. But, there may be a darker side:

Q. If these children were placed on the reservation, would you move back to the reservation? A. Yes.

Q. And reunite with your children? A. Yes.

Q. Is that part of the reason you want them to go to the reservation? A. Yes

The Tribe's counsel, hoping to rescue Reba, asked:

Q. You understand this court can still retain jurisdiction and transfer your kids to the reservation but you would still have to abide by this court's ruling? Do you understand that? A. Yes.

The State then asked:

Q. You haven't previously followed the court orders, have you? A. No, I haven't.

Q. Why is that? A. Because I'm a drug addict and it was very hard for me to get a handle on my problem.

More specifically, Reba had only seen the children six times over the past two years before the hearing. Those visits were in violation of a court order that required supervised visitation and only if she provided two clean UAs.

The foregoing testimony establishes to our satisfaction that it would be in the best interests of the children for them to remain temporarily in Sharon's custody and that she is a suitable person to have such custody.

Our view of the evidence also convinces us that the children no longer have any meaningful ties to the Tribe. The children have neither visited the reservation in over three years nor have they heard from any Tribe member during that time.

One parent favors transfer of the children to the reservation; the other does not. In these circumstances, the wishes of the parents carry little weight in our determination whether good cause exists to deviate from the § 1915(b) preferences.

Our review of the evidence leads us to conclude there are additional factors favoring the temporary placement here. First, in this phase of the child in need of assistance proceeding, the juvenile court will need additional information to determine a permanent placement for the children, be it with their father, mother, or a foster placement. We agree with the juvenile court that geography alone ensures difficulty in this respect should the children be temporarily located in Wyoming.

Second, we think the record amply demonstrates that Reba is attempting to use the Tribe to circumvent court supervision of her children.

Third, this is a temporary solution. Until the children reach Wyoming, the Monroes, Reba's relatives, have every incentive to provide information which—if it appears neither Reba nor Andrew can take permanent custody—may show them to be suitable extended family member placements. Once the children are there, temporarily or not, the Monroes have no such incentive.

Last, because this is a temporary solution, we are confident the juvenile authorities will consider the Tribe, a tribal foster family, or Reba's extended family for permanent placement. But, in the short term, the children should not be uprooted.

## VI. *Disposition.*

In sum, we conclude the biological father's refusal to consent to a transfer of jurisdiction to the Tribe in Wyoming foreclosed the possibility of such transfer. The juvenile court correctly denied the Tribe's motion to transfer.

Our interpretation of the ICWA leads us to conclude that we may consider the best interests of the children in addition to a number of other factors in deciding whether good cause exists to deviate from the § 1915(b) preferences. In our de novo review of the evidence, we are satisfied that good cause exists to deviate from such preferences and to leave temporary custody of the children with Sharon. Thus, the juvenile court correctly placed temporary custody of the children with Sharon.

In reaching our conclusions, we have carefully considered all of the Tribe's arguments whether or not we have addressed them. Finding no reason to disturb the juvenile court's order, we affirm.

**AFFIRMED.**