2003 OK CIV APP 24

### In the Matter of the ADOPTION OF BABY GIRL B., a Minor.

**Anthony Noah and Choctaw Nation of Oklahoma, Appellants,**

v.

**Kelly B., Appellee.**

### No. 96,985.

Court of Civil Appeals of Oklahoma, Division No. 2.

Feb. 11, 2003.

As Corrected March 20, 2003.

---

Robert L. Rabon, Rabon, Wolf & Rabon, Hugo, OK, Gerald Kelly, Oklahoma City, OK, for Appellants.

Robert G. Boren, Rebecca P. Boren, Oklahoma City, OK, and Bob Smith, Purcell, OK,

and Virginia Frank, Edmond, OK, for Appellees.

Opinion by KEITH RAPP, Judge:

¶1 The Choctaw Nation (Nation) and Anthony Noah (Father) appeal the trial court's decision declining to vacate its order terminating Father's parental rights and finding the child (Child), referred to here as Baby Girl B., eligible for adoption without his consent. Nation also appeals the trial court's decision which denied Nation's Motion For Placement of Child.[1] Upon review, this Court, affirms in part, reverses in part, vacates the order terminating Father's parental rights, and remands for further proceedings.

## BACKGROUND

¶2 The Child is an Indian child and Mother and Father are members of the Nation. The federal and State Indian Child Welfare Acts apply to this case. The judgment terminating Father's parental rights and finding the Child eligible for adoption without the Father's consent was essentially a default judgment. The first issue here is whether Father and Nation were properly and adequately notified of the proceeding leading to this judgment. Whether the trial court should have vacated the judgment at Father's request for good cause is collateral to this issue.

¶3 Adoption proceedings were originally filed in Oklahoma County. All parties, including the Child, were represented by counsel. The Nation and Father were parties and both were represented by the same attorney. The application of the Indian Child Welfare Acts was at issue.

¶4 On April 13, 2001, the Oklahoma County trial court ruled that the Acts applied.

This ruling had the effect of invalidating Mother's waivers and relinquishments. The Oklahoma County court's Order recited that the parties had agreed upon or did not dispute certain facts. Among these facts were: (1) Father is a parent as defined by the Indian Child Welfare Act; (2) Mother and Father were not wed nor cohabiting, Father had not supported the Child; (3) Mother and Father are members of the Choctaw Nation and the Child is an Indian child; and, (4) the Child was not being taken from an existing Indian family for purposes of adoption.[2]

¶5 A minute entry indicates that the Adoptive Parents requested and were granted a stay in order to seek appellate relief. However, they dismissed the case. Then, on May 8, 2001, Mother executed a voluntary relinquishment of parental rights and consent to adoption and presented it to the District Court in Canadian County.[3] The record does not reflect any notice to or involvement by Father or Nation in the Canadian County matter or that the Child was represented there. The relinquishment also recites that the Mother agrees to transfer custody to Adoptive Parents. The relinquishment wholly fails to mention anything related to the facts concerning Indian heritage or the application of Indian Child Welfare Acts. The relinquishment and consent were approved by the judge in Canadian County.

¶6 Thereafter, on May 10, 2001, the proceedings leading to this appeal were filed in Cleveland County. Adoptive Parents filed an application to determine eligibility for adoption without Father's consent, pursuant to 10 O.S. Supp.2000, § 7505–4.2, for failure to provide support, and to terminate Father's parental rights. The application does not mention any information pertaining to Indian

---

1. The "Appellees" are not listed in the caption of the petition-in-error but that pleading was served on the anonymous adoptive parents (Adoptive Parents), and Child's mother, Kelly Bohanon (Mother). All of these persons have filed an Answer Brief here and will be deemed the Appellees in this Court. Child was not represented before the Cleveland County trial court and has no attorney here. Mother has relinquished her parental rights and consented to adoption. Mother's decisions are not before this Court for review.

2. At the hearing on his motion to vacate held in Cleveland County, Father acknowledged that he was the Child's parent and testified that he filed an affidavit of paternity in Oklahoma County. Transcript, August 7, 2001, page 33.

3. Mother was represented by counsel. Counsel for Adoptive Parents was also present.

heritage or application of Indian Child Welfare Acts.

¶ 7 On May 10, 2001, counsel for Adoptive Parents also executed and filed a "Notice of Adoption Proceedings" wherein the Indian heritage history is set forth, including the statement that "the natural father is known as Anthony Noah...." The Choctaw Nation was notified of intervention rights. However, the Notice states in paragraph 5 that "the natural mother *will file an application* with the court to proceed without the consent of the birth father...." (Emphasis added.)[4] This notice and Mother's relinquishment and statement of preferences were mailed certified mail to Nation and the Bureau of Indian Affairs, but the application is not shown to have been served.[5]

¶ 8 A notice of hearing of the Adoptive Parent's application was signed by the trial court and filed on May 10, 2001. This notice was directed to Father. It advised him of the relief sought, eligibility for adoption without his consent and termination of parental rights for failure to support. The notice advised that the hearing date was July 2, 2001, at 9:15 o'clock A.M. in the District Court of Cleveland County, but provided no street address.

¶ 9 The notice did not advise of any rights accompanying matters proceeding under Indian Child Welfare Acts. This includes a right to an attorney or provision for an attorney, or rights or procedures available through the Indian Tribe. Father resided in Broken Bow, Oklahoma, where he was personally served with the notice and the application on June 13, 2001.

¶ 10 In the interim, it appears that the judges assigned to the case in Oklahoma County and Cleveland County discussed where the case ought to be heard and decided that it should be heard in Oklahoma County. This discussion appears to have

taken place without knowledge of counsel, but Adoptive Parents' counsel learned of the proposed transfer and filed a motion to vacate the transfer order on May 29, 2001. This motion shows a certificate of mailing to the attorney who acted as counsel for Nation and Father in the Oklahoma County proceedings. The filed document shows a notice that the motion will be heard on June 5, 2001, at 8:30 o'clock A.M.

¶ 11 On June 4, 2001, a motion to intervene for the purpose of resisting the motion to vacate the transfer was filed on behalf of Nation only. The trial court vacated the transfer. A minute order recites the action and states further that "July 3, 01 still pends." According to a letter from the Cleveland County judge to the Oklahoma County judge, counsel for Nation and the attorney shown as counsel for Mother agreed that the matter should proceed in Cleveland County.[6]

¶ 12 On June 13, 2001, counsel for the Nation filed a Motion for Different Placement Preferences. The motion sought to have the statutory preferences of 25 U.S.C. § 1915 followed rather than Mother's statement of preference for Adoptive Parents. This motion was mailed to all counsel, but, again, the mailing did not include the Father.

¶ 13 On July 2, 2001, the Cleveland County trial court entered an order that determined the Child eligible for adoption without Father's consent and terminated Father's parental rights. Father did not appear, so the determination was by default as to him. The trial court made a finding that Father had been served notice more than fifteen days prior and approved the notice to him. The order refers to Father as the "putative father." The determination makes no mention of anything related to Indian matters or of Nation. There is no indication in the record that the order was served on Father or Nation.

---

4. Record, page 3.

5. The application has no certificate of service. Record, page 1–2. On August 13, 2001, counsel for Adoptive Parents filed an affidavit of mailing listing only the Notice and documents other than the application. Record, page 70. The mail receipts are dated May 14, 2001.

6. It appears from the statement of counsel at the hearing that the June 5, 2001, hearing was attended by all counsel, but was postponed to the following day and to a different location due to lack of a reporter. Counsel for Nation stated that he returned but was unable to locate the new location until after the matter was heard.

¶ 14 However, on July 6, 2001, Nation and Father filed a joint motion to invalidate the July 2, 2001 proceeding based upon lack of notice to Nation and inadequate notice to Father, all as required by the federal and State Indian Child Welfare Acts. In addition, Father filed a separate motion to vacate on the ground of unavoidable casualty.

¶ 15 At the hearing on the motions, Father testified that he had been served notice, but he did not discuss the matter with counsel for Nation who had represented him in Oklahoma County.[7] Father related that he and his family left Broken Bow at about four o'clock on the morning of July 2, 2001, to come to Norman for the hearing, and arrived in Norman at about 8:30 o'clock A.M. They did not know where to go and asked directions several times but got lost. They arrived at the courthouse at about 10:00 o'clock A.M., proceeded to the trial judge's office, and were informed that the hearing was over. Counsel for Nation also did not appear, and at that time he had not entered an appearance as counsel for Father.

¶ 16 On the placement issue, Nation presented the great-grandmother of the Child, who testified as to her willingness and ability to care for the Child and to provide a residence. Next, a family counselor employed by Nation testified as one knowledgeable about Indian family life. The witness explained about cultural deprivation and the problems associated with that condition as an individual matures. An earlier witness testified as to the services, foster homes, and facilities available from the Nation along with testimony that the application to terminate Father's rights document had not been received by the Nation.

¶ 17 Mother testified on behalf of Adoptive Parents. She stated that she asked Nation for assistance, but was refused help. However, on cross-examination, she stated that she had previously asked for help with her other children before she was pregnant with the Child and did not ask for the Nation's assistance because she assumed it would be denied. This was her third child, and one of the other two children is in the custody of the Department of Human Services. She eventually met the Adoptive Parents through their counsel. She formally expressed her desire that the Child be adopted by them.

¶ 18 The Adoptive Parents presented a specialist in child psychology who testified as to bonding in general and that the Child bonded with the Adoptive Parents. This individual was not an expert in Indian family life or culture.

¶ 19 The trial court denied relief. The court found that notice was provided, that custody would not be changed, and that the Child's eligibility for adoption remained in force. Nation and Father appeal.

## STANDARD OF REVIEW

■ ¶ 20 The appellate court will exercise its "plenary, independent and non-deferential authority [when] reexamin[ing] a trial court's legal rulings." *Neil Acquisition, L.L.C. v. Wingrod Inv. Corp.*, 1996 OK 125, ¶ 5, 932 P.2d 1100, 1103 n. 1; *Spielmann v. Hayes*, 2000 OK CIV APP 44, ¶ 8, 3 P.3d 711, 713.

■ ¶ 21 The standard of review for a trial court's conclusion regarding a child's eligibility for adoption without the consent of the biological parent is whether it is supported by the clear weight of the requisite clear and convincing evidence.[8] *In re Adoption of R.W.S.*, 1997 OK 148, ¶ 10, 951 P.2d 83, 86 (*reh'g.denied*); *In re Adoption of J.L.H.*, 1987 OK 25, ¶ 12, 737 P.2d 915, 918. However, the issue on appeal is whether the court erred in failing to vacate what was essentially a default judgment. The test for measuring the legal correctness of the trial court's ruling on a motion to vacate or set aside judgment is whether sound discretion was exercised upon sufficient cause shown to vacate, modify, open or correct its earlier decision, or to refuse the relief sought. *Van-Nort v. Davis*, 1990 OK CIV APP 95, ¶ 9, 800 P.2d 1082, 1085.

---

7. At all times involved in this case, whenever Father was represented he was represented by the same attorney that represents Nation.

8. *See In re S.B.C.*, 2002 OK 83, 64 P.3d 1080.

## ANALYSIS AND REVIEW

¶ 22 Both appeals, as briefed here, concentrate on the issue of whether notice was adequate and complied with governing law. In addition, Nation challenges the trial court's decision denying its motion for different placement.

¶ 23 This Court takes cognizance of the policy underlying the federal and State Indian Child Welfare Acts. When enacting the Indian Child Welfare Act, Congress found:

> (3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children ...;
>
> (4) that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and
>
> (5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.

25 U.S.C. § 1901.

¶ 24 "Indeed, the congressional findings that are a part of the statute demonstrate that Congress perceived the States and their courts as partly responsible for the problem it intended to correct." *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 44, 109 S.Ct. 1597, 1606, 104 L.Ed.2d 29 (1989). The law is intended not only to protect the rights of Indian children, but also the interests of Indian Tribes in survival. Thus, care must be taken in such cases to avoid a purely Anglo–American perspective.

### Father's Motion to Vacate

■ ¶ 25 In the petition-in-error, a point of error was raised about Father's late arrival at court and being lost. Although not referenced there, this alludes to unavoidable circumstances allegations made by Father in his motion to vacate under 10 O.S. Supp.2000, § 7505–4.1(H). However, the issue was not briefed. In fact, Section 7505–4.1(H) is not cited in the appellate brief. This issue is thus waived. *See State ex rel. Jones v. Baggett,* 1999 OK 68, 990 P.2d 235 n. 5.

### Nation's and Father's Motion to Vacate

¶ 26 25 U.S.C. § 1914 authorizes the Child's Tribe, here Nation, and "any parent from whose custody such child was removed" to petition the court to vacate its decision upon a showing of a violation of Sections 1911, 1912, and 1913 of Title 25. The challenge here is to the notices given to Father and to Nation.

■ ¶ 27 Adoptive Parents take the position that the notice to Nation complies with the law; that Father's notice complied with the applicable law that Father is not a parent under the Indian Child Welfare Acts and is not a custodian of the Child, so he has no right to specialized notice and no standing. The Adoptive Parents' position is rejected for the following reasons.

¶ 28 The facts here do not fit precisely into the statutory scheme because the Child has never been in Father's custody, which is not disputed. Adoptive Parents argue that Father's lack of custody means, first, that he does not have standing here, so the stringent burden of proof does not apply. Thus, Section 1914 authorizes a parent "from whose custody such child was removed" to seek invalidation of the proceedings. In addition, the expert witness requirement and the standards of proof in Section 1912(e) and (f) relating to placements and terminations insert the phrase "the continued custody of the child" into consideration, so Adoptive Parents' second argument is that the expert witness rule does not apply here.

¶ 29 The facts elicited below indicate that Mother and Father had a short liaison of about three weeks. When she learned that she was pregnant, she did not contact the Nation for assistance, believing that it would be futile. She contacted Adoptive Parents' counsel, and proceedings were started in Oklahoma County, where Father was served with notice. He testified without contra-

diction that his first knowledge of the Child occurred after the Child's birth and as a result of the Oklahoma County matter. He did not know that Mother had been pregnant.[9]

¶ 30 Father arranged for a DNA test and filed an affidavit in the Oklahoma County matter acknowledging paternity. He also then sent some support money in care of Adoptive Parents' attorney. Neither the amount of support sent nor any support order are reflected in the record here.

¶ 31 In three cases the Oklahoma Supreme Court has ruled that, under the facts of those cases, the absence of custody with the father rendered the Indian Child Welfare Acts inapplicable to the case situations. In *In re Adoption of D.M.J.*, 1985 OK 92, 741 P.2d 1386, custody had been previously awarded to the mother in a prior divorce action. The father's parental rights were terminated for nonsupport and he appealed, joined by the Cherokee Nation, raising issues under the Indian Child Welfare Act. The case of *In re Adoption of Baby Boy D.*, 1985 OK 93, 742 P.2d 1059, involved an Indian father, a non-Indian mother, and existing awareness of fatherhood on the part of the father coupled with apparent disregard for the child.

¶ 32 The facts of *In re S.C. and J.C.*, 1992 OK 98, 833 P.2d 1249, involved an Indian father who sought to invalidate a placement decision made after the non-Indian mother's parental rights had been terminated.[10] The father knew about the children. Moreover, efforts were made to place the children with father, but studies of his home, including one by the Cherokee Nation, indicated that the best interests of the children would not be served by placement with father. There, the Cherokee Nation only sought visitation for the father, so it cannot be said that the

Indian Child Welfare Acts had no role in the case.

¶ 33 A common thread among these cases is that the father knew about the children in each case. Here, it is unrefuted that Father first learned of the Child and his parenthood as a result of the Oklahoma County proceedings. Upon learning of his parenthood, he then took steps to acknowledge paternity and provide support. The case was then dismissed by Adoptive Parents.

■ ¶ 34 In the present proceedings, no determination has been made that Father has had a reasonable opportunity to establish custody or that he has waived any right to seek custody or placement of the Child in accordance with the Indian Child Welfare Acts. Unfortunately, his claim of unavoidable circumstances in the default termination portion of this case has not been preserved for review. Nevertheless, this Court distinguishes the prior cases and holds that when, as here, a father has no reasonable notice of fatherhood, then the Acts do not preclude him from asserting rights under those Acts simply because he had not been, through no fault of his own, a custodial parent.[11]

¶ 35 This result is consistent with the policies and purposes of the Acts to preserve and protect the interests of Indian children, Indian Tribes, and Indian families, and to keep Indian children in homes that reflect Indian culture and values. 25 U.S.C. § 1902; 10 O.S. Supp.2000, § 40.1. Moreover, it must be observed that custody is immaterial as to the interest of the Nation and application of the Oklahoma Act. 10 O.S. Supp.2000, §§ 40.1, 40.3(B).

¶ 36 On the question of notice, this Court holds that neither of the notices complied with applicable law, but that the Nation was not prejudiced by defective notice to it be-

9. Transcript, July 10, 2001, page 55.

10. The "existing Indian family" controversy has specifically been eliminated from these proceedings by the parties. Moreover, here Mother is an Indian whereas in *In re S.C. and J.C.* the mother was non-Indian.

11. Compare *Miller v. Miller*, 1998 OK 24, 956 P.2d 887, where the facts indicated that the mother fraudulently led the father to believe he

was the father. The Court held that a true claim of an existing pregnancy coupled with a false representation that the child is that of the proposed spouse, states a fraud claim. Thus, a father could deny paternity when the true facts were withheld. This Court perceives no legal reason to find that the obverse will not apply—a father may assert paternity, and all rights associated therewith, when the true facts have been withheld from him.

cause it intervened prior to the termination proceedings. However, Nation may seek to vacate the proceedings due to the defective notice to Father, and, under the circumstances, the trial court should have vacated the proceedings and erred in failing to do so.

### A. Notice to Father

■ ¶ 37 Nation and Father argue that the notice served upon Father did not comply with the provisions of 10 O.S. Supp.2000, § 40.4.[12] The notice deficiencies include: (1) lack of tribal identification of the Child; (2) lack of statement of rights; and (3) advice regarding right to counsel.

¶ 38 First, if Father is entitled to the notice required under the Indian Child Welfare Act, the notice to Father did not meet the statutory requirements. Adoptive Parents do not argue otherwise, but maintain that Father is not a parent entitled to Section 40.4 notice because he is an unwed father. This Court rejected, above, their argument that he has no standing because he never had custody.

¶ 39 The statute, 25 U.S.C. § 1903(9), excludes from the definition of "parent" the "unwed father where paternity has not been acknowledged or established," which is not the case here. Under Section 1914, the authority to petition to vacate is given to a parent from whom custody was removed for violations of Sections 1911, 1912, or 1913.[13] Section 1912, as amplified by State statute, requires notice, provides for right to counsel,

access to information, prerequisites to termination decisions, and a "beyond a reasonable doubt" standard of proof for termination proceedings coupled with a requirement to support the proof with expert testimony.

¶ 40 Here, there was undisputed evidence that, in the Oklahoma County matter, Father had taken a DNA test which established his paternity. Counsel for Adoptive Parents referred to this test in statements to the Cleveland County trial court. Now, Adoptive Parents argue that Father has not complied with the statute so he is not an "acknowledged" parent. They refer to 10 O.S. Supp.2000, § 70(B)(1), which calls for an affidavit from Mother and Father. However, they have ignored and failed to discuss Section 70(B)(2), which provides for an alternative means to establish paternity by means of a scientific test.

¶ 41 Next, the uncontradicted evidence presented here also demonstrated that Father acknowledged paternity by affidavit in the Oklahoma County proceedings based upon a scientific test showing him to be the biological father of the Child. Adoptive Parents argue that the record does not support a conclusion that a proper acknowledgment had been made by Father prior to the initiation of the Cleveland County proceedings. First, this Court holds that sufficient evidence was placed before the trial court so that further inquiry was mandatory in order to ascertain whether Father had previously

---

12. Section 40.4 provides:
 In all Indian child custody proceedings of the Oklahoma Indian Child Welfare Act, including voluntary court proceedings and review hearings, the court shall ensure that the district attorney or other person initiating the proceeding shall send notice to the parents or to the Indian custodians, if any, and to the tribe that is or may be the tribe of the Indian child, and to the appropriate Bureau of Indian Affairs area office, by registered mail return receipt requested. The notice shall be written in clear and understandable language and include the following information:
 1. The name and tribal affiliation of the Indian child;
 2. A copy of the petition by which the proceeding was initiated;
 3. A statement of the rights of the biological parents or Indian custodians, and the Indian tribe:

 a. to intervene in the proceeding,
 b. to petition the court to transfer the proceeding to the tribal court of the Indian child, and
 c. to request an additional twenty (20) days from receipt of notice to prepare for the proceeding; further extensions of time may be granted with court approval;
 4. A statement of the potential legal consequences of an adjudication on the future custodial rights of the parents or Indian custodians;
 5. A statement that if the parents or Indian custodians are unable to afford counsel, counsel will be appointed to represent them; and
 6. A statement that tribal officials should keep confidential the information contained in the notice.

13. Sections 1911 and 1913 are not involved here.

qualified as a "parent" under the law and thus entitled to the full range of notice. The fact of Indian relationships coupled with the strong legislative policies here involved, compel full examination and determination of the facts so that State laws or procedures do not deliberately or inadvertently work to frustrate the interests involved or the application of the Acts. Thus, for example, a parent cannot frustrate the purposes and intent of the Acts by the expedient of changing domicile under state law. *In re Adoption of Halloway,* 732 P.2d 962, 966 (Utah 1986).

¶ 42 Second, the Order entered in the Oklahoma County cause was before the trial court here. The Order stated that the parties had agreed to and did not dispute certain facts, one of which was that Father is a parent as defined in the Indian Child Welfare Acts. Moreover, Adoptive Parents did not contest applicability of the Indian Child Welfare Acts when the case was filed in Cleveland County. Adoptive Parents offer no reason for ignoring the statements in the Order. The existence of such statements adds an additional reason to inquire into Father's legal status as a parent and to make a specific finding as to Father's legal status as a parent and applicability of the Acts.

¶ 43 Moreover, this Court notes that under the Oklahoma Act, notice is to be provided "to the parents." 10 O.S. Supp.2000, § 40.4. The Oklahoma Act does not include the federal definition of "parent" that excludes the unwed father where paternity has not been established or acknowledged. 25 U.S.C. § 1903(9).

¶ 44 Nevertheless, according to Adoptive Parents, the federal definition of parent applies here because the Oklahoma Act does not apply unless the federal Act applies. In support of this position they cite *In re Adoption of D.M.J.,* 1985 OK 92, ¶ 9, 741 P.2d 1386, 1388, where the Court made such observation. However, the context shows that the Court also observed that the Oklahoma Act clarified Oklahoma's role, as well as expressed this State's intent to "cooperate fully with Indian tribes in Oklahoma in order to insure that the intent and provisions of the Federal Indian Child Welfare Act are enforced." *Id.* Adoptive Parents point to no authority limiting the interpretation of "parent" in the Oklahoma Act by the same limitation contained in the federal Act nor can they ignore Father's established paternity.

¶ 45 Here, the trial court's Order cryptically denies Father's Motion to Vacate, stating notice was provided. Father did receive some notice. He tried to come to the court, became lost, and he was tardy. However, the notice elements missing here clearly go to more than the notice of time and date of a hearing.[14] Obviously, Father was not represented by chosen or appointed counsel at a critical stage of these proceedings. No evidence exists showing he had waived a right to counsel. In fact, he testified that he believed he was represented by Nation's counsel, but that was not the case at that time.

¶ 46 Adoptive Parents started a new action for adoption. They were under an obligation to furnish adequate notice and wholly failed to do so. They have not shown any excuse for the failure to give adequate and correct notice, nor any basis to excuse the failure such as lack of prejudice. The trial court has not made any findings regarding Father's entitlement to notice as provided by the Indian Child Welfare Acts, but this Court holds that Father, under the record presented, was entitled to notice as provided in these Acts.

¶ 47 Failure to provide adequate notice is fatal to the proceedings. Due Process demands that notice reasonably inform a person that his or her legally protected interest may be adversely affected. A purpose of notice is to afford an opportunity to defend. Judicial notice cannot depend upon inferences to be gathered from outside sources or other events. Clarity and completeness are essential to preservation of the procedural safeguards afforded by Due Process of Law norms. Lack of specificity renders the safeguards meaningless. *In re C.G.,* 1981 OK 131, ¶¶ 9–10, 637 P.2d 66, 68–69.

### Notice To Nation

■ ¶ 48 The notice to Nation stated that the termination and adoption without consent

---

**14.** The notice of the place of the hearing is somewhat lax in specificity and may have contributed to the tardiness, but that has not been raised here.

petition "will" be filed. It was properly mailed. In the hearing on the motion to vacate, counsel for Adoptive Parents stated, "We set out in that notice the fact that the natural mother *would* be filing an application with the court to proceed without the consent of the birth father." The application had in fact been filed at that time. Thus, the notice was misleading and it has not been shown that the application or a notice of hearing date was served on Nation.

¶ 49 However, Nation intervened to argue for a transfer of the case's venue back to Oklahoma County. The court's letter to the Oklahoma County judge and the minute Order indicate an agreed disposition of the transfer issue. Neither the order nor the letter reflect the correct day for the termination without consent hearing, and, in the case of the letter, nothing is said about a hearing date.

¶ 50 Nation's intervention states that Nation resists Adoptive Parents' "motion to vacate transfer order." The Adoptive Parents' motion to vacate transfer order had been mailed to counsel for Nation. The body of the motion recites a history of the case, including the filing of an application for adoption in Cleveland County. The motion continues by saying that Adoptive Parents' counsel conferred with Nation's counsel about the filing, his representation in the matter, and whether the issue for decision was if grounds existed for termination of the birth father's rights as a parent.

¶ 51 Then, Nation filed its motion concerning placement preferences. The content of this filing indicates awareness of at least some of what had been filed in the case, such as Mother's consent to adoption and preference for the Adoptive Parents. Moreover, counsel for Nation had been to Cleveland County on June 5 and June 6, 2001, but the record is silent regarding whether he availed himself of the opportunity to view the court file. Counsel for Nation was in contact with counsel for Adoptive Parents, but again, the record is silent regarding any discussions about the filing of the application.

¶ 52 On the record here, it appears that counsel for Adoptive Parents and counsel for Nation were equally remiss in the matter of notice, but it cannot be said that the Nation was itself prejudiced. In addition, Nation did not seek to remove this action to a Tribal Court, nor did it request additional time as contemplated by 10 O.S. Supp.2000, § 40.4(3)(c). Thus, the record fails to show that Nation lacked sufficient information so as to enable it to intervene and take such action as it deemed necessary.

¶ 53 Moreover, regardless of whether it might have been prejudiced by a decision terminating Father's parental rights, Nation does not present its case on that ground. Nation chose the level of involvement before the trial court in Cleveland County, as shown by its pleadings, and limited its involvement to issues of placement and adequacy of notice. Thus, although Father and Nation share counsel and a common concern about adequacy of notice and conformity to legal requirements, Nation did not seek to act as a surrogate for Father to resist, *on the merits,* termination of his parental rights.

¶ 54 Therefore, even though the notice to Nation was misleading, the trial court's decision not to invalidate on this ground is not clearly error because of the absence of prejudice to Nation.

### Placement Decision

¶ 55 Here, two issues are presented with respect to placing the Child with the Adoptive Parents pending further proceedings. The first issue asks whether good cause has been given not to follow the statutory preference scheme. The second issue involves determining who bears responsibility to involve Indian Tribes in the placement decisions, as well as the legal ramifications following failure to conform to that responsibility.

### A. The Good Cause Issue

¶ 56 The statutes establish a preferential scheme for placement of a child in sundry cases, including preadoptive placements. 25 U.S.C. § 1915.[15] The Oklahoma statute

---

**15.** 25 U.S.C. § 1915 provides in part:

(b) Foster care or preadoptive placements; criteria; preferences

adopts the federal preference scheme. The significant language here is the mandatory direction to give preference as directed under the Act in the *"absence of good cause to the contrary"* because this language manifests a presumptive preference in favor of Indian placement.

¶ 57 This language presents three questions for consideration at this juncture:

(1) Who bears the burden to overcome the presumption established in the statute;

(2) What constitutes "good cause"; and,

(3) What is the applicable standard of proof.

¶ 58 This Court holds that a party who advocates a placement other than prescribed by statute bears the burden to establish good cause to disregard the statute. This Court next holds that "good cause" involves multifaceted determinations concerning the best interests of the child or children involved *and* the Tribal interest, keeping in mind the fostering of the purposes and policies of the Indian Child Welfare Acts, the need for expert testimony, and the Bureau of Indian Affairs Guidelines.[16] Last, this Court holds that the "clear and convincing" standard of evidence applies when a trial court considers whether a party who has the burden of proof has established "good cause" to disregard the

preadoption placement preferences in the statute.

### 1. Burden of Proof

 ¶ 59 The clear language of the statute establishes a presumptive placement scheme, and not by default in the absence of some alternative. Thus, the trial court must be convinced to depart from the statutory scheme. The party seeking that result then must persuade the court. *In re Adoption of Riffle*, 277 Mont. 388, 922 P.2d 510, 514 (1996); *see In re Adoption of F.H.*, 851 P.2d 1361, 1363 (Alaska 1993). Moreover, the Guidelines state:

> Proceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to these preferences.

Guidelines, 44 Fed.Reg. at 67586.

¶ 60 Here, the burden of proof rested with Adoptive Parents as to why the statutory scheme should not be followed.

### 2. What constitutes "good cause".

 ¶ 61 The federal Act provides that the preadoption preferences shall be followed, but does not include a definition of

---

Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the *absence of good cause to the contrary*, to a placement with—

(i) a member of the Indian child's extended family;

(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

(c) Tribal resolution for different order of preference; personal preference considered; anonymity in application of preferences

In the case of a placement under subsection (a) or (b) of this section, if the

Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section. Where appropriate, the preference of the Indian child or parent shall be considered: Provided, That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences.

(d) Social and cultural standards applicable

The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties.

(Emphasis added.)

**16.** Guidelines for State Courts; Indian Child Custody Proceedings. 44 Fed.Reg. 67583. The Guidelines provide preadoptive placement guidance. *Id.* at 67594.

what constitutes "good cause" not to follow the statutory scheme. The Guidelines do not fill in the gap, although the Guidelines do provide a list of factors.[17] The factors listed in the Guidelines reiterate the provisions of the statute, Section 1915(b).[18] As a result there has been some disparity in court treatment of the concept of "good cause".

¶ 62 One line of authority looks to the traditional best interests of the child approach. The Court in *In re Interest of Bird Head*, 213 Neb. 741, 331 N.W.2d 785 (1983), directed the trial court to consider the good cause issue keeping in mind that the Act did not override the best interest of the child test.

> The Indian Child Welfare Act does not change the cardinal rule that the best interests of the child are paramount, although it may alter its focus. The legislative history of the act states explicitly that the use of the term "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child. Factual support in the record in the trial court as to "good cause" for failure to comply with statutory child placement preference directives are necessary for appropriate appellate review.

*Id.* at 791.

¶ 63 Other cases take the approach that the Act's scheme and design incorporate the child's best interests. These cases deem the Act to be a presumptive statement of the child's best interests. *In re Adoption of Riffle* is an example.

> We believe, however, that a finding of good cause cannot be based simply on a determination that placement outside the preferences would be in the child's best interests. The plain language of the Act read as a whole and its legislative history clearly indicate that state courts are a part of

the problem the ICWA *was intended to remedy*. See *Mississippi Band of Choctaw Indians*, 490 U.S. at 44–45, 109 S.Ct. at 1606–07.... The best interests of the child standard, by its very nature, requires a subjective evaluation of a multitude of factors, many, if not all of which are imbued with the values of majority culture. It therefore seems "most improbable" that Congress intended to allow state courts to find good cause whenever they determined that a placement outside the preferences of § 1915 was in the Indian child's best interests.

*Id.* at 514.

¶ 64 Other courts take a more expansive approach. Thus, factors in addition to a child's best interest are taken into account to determine whether "good cause" exists to depart from the placement preferences. *In re A.E., J.E., S.E., and X.E*, 572 N.W.2d 579 (Iowa 1997).

> Good cause is a matter of discretion, and discretion must be exercised in light of many factors. These include but are not necessarily limited to the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement, the child's ties to the tribe, and the child's ability to make any cultural adjustments necessitated by a particular placement.

*Id.* at 583.

¶ 65 The same "good cause" problem exists when the decision is whether to reject transfer to a tribal court. 25 U.S.C. § 1911(b). Again, courts are split on whether to consider the child's best interests.[19] Some courts find that the child's best interests are integral to decision-making involving children so that such interest must be an element for consideration at every stage of the proceeding. *In re Guardianship of J.O.*, 327 N.J.Su-

---

**17.** See *In re N.L.*, 1988 OK 39, 754 P.2d 863 (Opala concurring, 1988 OK at ¶¶ 27–29, 754 P.2d at 876–77, for a discussion in the context of good cause to decline a request to transfer a case to a Tribal Court.) A similar absence of a definition for "good cause" exists in that context.

**18.** See Note 15.

**19.** See Michael J. Dale, *State Court Jurisdiction Under the Indian Child Welfare Act and the Unstated Best Interest of the Child Test*, 27 Gonz. L.Rev. 353, 387 (1991–92). In contrast, transfer under Section 1911(a) is mandatory because exclusive jurisdiction there rests with the tribal court. *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29.

per. 304, 743 A.2d 341, 348–49 (2000). The Court in the case of *In re Maricopa County Juvenile Action No. JS–8287*, 171 Ariz. 104, 828 P.2d 1245, 1250–52 (Ariz.Ct.App.1991), ruled that a child's best interest was a factor, along with the Guidelines.

¶ 66 Other courts simply state that a child's best interest is a factor, without elaboration, but in all of these cases additional factors and the Guidelines were also present. *Matter of M.E.M.*, 195 Mont. 329, 635 P.2d 1313, 1317 (1981) and *In re Robert T.*, 200 Cal.App.3d 657, 246 Cal.Rptr. 168, 174–75 (1988), provide examples. In the case of *Matter of M.E.M.*, the Court directed that best interests of the child, in addition to the Guidelines, be considered on remand.[20]

¶ 67 The Oklahoma Supreme Court, citing *Matter of M.E.M.*, has stated that best interest of the child is a factor. *In re N.L.*, 1988 OK 39, 754 P.2d 863. However, the other factors listed in the statute must also be considered and failure to do so constitutes reversible error.

> A finding of "good cause to the contrary" is predicated upon the court's consideration of the placement categories specified. Where no inquiry occurs as to whether the child's tribe has licensed, approved, or specified a foster home, the court has not adequately considered such a placement. We remand the case for a new dispositional hearing because the record does not disclose that the trial court afforded placement preference to the categories specified in 25 U.S.C. § 1915.
>
> On remand the court should consider whether the "good cause" exception in § 1915 is met by the child's best interests. *In re Interest of Bird Head*, 213 Neb. 741, 331 N.W.2d 785, 791 (1983).

*Id.*, 1988 OK 39 at ¶¶ 36–38, 754 P.2d at 870.

¶ 68 The Oklahoma Supreme Court's citation to *In re Bird Head*, coupled with the directive to examine and apply the statutory preferences aligns it with the expansive view line of authority. Therefore, this Court holds that, under the authority of *In re N.L.*, a child's best interest is a criterion to consider, albeit not the sole criterion, because other factors, including those set forth in the statutes and the Guidelines must also be considered.[21]

¶ 69 Further elaboration is called for at this juncture because "good cause" is not defined. Good cause must be viewed in two contexts—good cause that is personal to the children, and good cause that is extrapersonal.[22]

¶ 70 The former pertains to the nurture, care, and welfare of the children **and,** when Indian children are involved, exposure to and cultivation of the social and cultural aspects of Indian life, their Indian culture, and Indian heritage.[23]

¶ 71 Factors relating to good cause personal to children are found in *Yavapai–Apache Tribe v. Mejia*, 906 S.W.2d 152 (Tex.Civ.App. 1995), where it is stated:

> The best interest of the child test in the Anglo–American legal systems considers a number of factors: (1) the desires of the child; (2) the emotional and physical need of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not

**20.** Implicit in this directive is the conclusion that the best interests criterion is not included as one of the Guidelines.

**21.** This result is consistent with this Court's holding that the same factors apply when the issue is good cause to deny transfer to a tribal court. *In re Adoption of S.W. and C.S.*, 2002 OK CIV APP 26, 41 P.3d 1003.

**22.** The Guidelines *exclude* from consideration socio-economic conditions and perceived adequacy of the tribal judicial system or social services structure. Guidelines, § C.3(c), 44 Fed.Reg. at 67591. Also, the children here are younger than the ages listed in Section C.3.

**23.** These are also proper concerns when a final decision is made concerning the children.

a proper one; and (9) any excuse for the acts or omissions of the parent.

*Id.* at 168.

¶ 72 The extrapersonal context of best interests refers to the means, resources, and procedures available and used to preserve and protect the personal best interests of the children *and to the Tribal and cultural interests specially involved.* Thus, the courts consider this aspect of best interest when they hold that the FICWA and the Guidelines apply. Good cause in the context of the FICWA has often been examined in relation to extrapersonal best interest matters.[24]

¶ 73 The trial court's task is to engage in a fact-finding process leading to a determination of the children's best interests, yet keeping in mind the permanent facts that Indian children and an Indian nation are involved. Thus, while the foregoing components of best interests from *Yavapai–Apache Tribe v. Mejia* are not exhaustive, the list, in conjunction with the Indian aspects of the case *and the need to view the case from a different perspective,* do indicate a number of relevant considerations. However, when the best interests standard is used, care must be taken to avoid a purely Anglo–American point of view.[25] In addition, the best interests inquiry should be consistent with the best interests inquiry on final placement.[26]

### iii. The Standard of Proof

■ ¶ 74 Having rejected Adoptive Parents' arguments arising from Father's lack of custody and his legal status as a parent, this review now proceeds to consideration of the standard of proof applicable here. The federal Indian Child Welfare Act establishes burdens of proof for some determinations under the Act, however, Section 1915(b) does not specify the degree of proof necessary to establish good cause to disregard the statutory placement preferences, in cases such as the one before this Court. Similarly, the Guidelines do not provide an answer.

¶ 75 By comparison, an order effecting a foster care placement requires evidence of a clear and convincing quality that *continued parental custody* will be harmful and the "beyond a reasonable doubt" burden applies to termination orders.[27] 25 U.S.C. §§ 1912(e)-(f).

¶ 76 The Court in *In re Adoption of F.H.* authorized a preponderance of the evidence test, but also expanded the scope of consideration beyond a child's best interest to include the wishes of the biological parents, the suitability of the persons preferred for placement, the child, the child's tribal ties, and the standards prescribed in the Act. *Id.* 851 P.2d at 1363–64.

¶ 77 This Court holds that, in the specific context of Section 1915(b) placements, the party opposing the statutory preferences must establish good cause according to the "clear and convincing" evidence standard.

---

24. For example, in *In re Wayne R.N.*, 107 N.M. 341, 757 P.2d 1333 (N.M.Ct.App.1988), the court determination of whether good cause had been shown not to transfer a case will necessarily be made on a case by case basis. *Id.* at 1335.

25. Whether the "Anglo" best interest of the child test should be an element of the good cause test has been questioned. Michael J. Dale, *State Court Jurisdiction Under the Indian Child Welfare Act and the Unstated Best Interest of the Child Test,* 27 Gonz. L.Rev. 353, 387 (1991–92). The Court in *Yavapai–Apache Tribe v. Mejia* found that the FICWA is silent on the issue and that the Guidelines suggest the best interest of the child has no place in determining good cause.

26. The trial court and the parties should also be cognizant of the "qualified expert witness" requirements of 25 U.S.C. § 1912(f). The qualified expert testimony diminishes the risk of cultural bias. *In re N.L.*, 1988 OK 39 at ¶ 17, 754 P.2d at

867. For a review of the guidelines for qualification of an expert see *In re N.L.*, 1988 OK 39 at ¶¶ 14–24, 754 P.2d at 866–68. It has been held that such expertise includes a person with special skills and knowledge of the social and cultural aspect of Indian life. *State v. Woodruff,* 108 Or.App. 352, 816 P.2d 623, 626 (1991); *State v. Charles,* 70 Or.App. 10, 688 P.2d 1354 (1984). A review of the *Charles* decision's holding on this point was dismissed because of the correctness of a separate holding. *State v. Charles,* 299 Or. 341, 701 P.2d 1052 (1985). *See also In re Welfare of T.J.J. & G.L.J.,* 366 N.W.2d 651 (Minn.Ct.App.1985), where the Court found the experts to be qualified who possessed training in Indian culture.

27. Clear and convincing evidence is defined as a degree of proof that produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established. *In re M.B.,* 2000 OK CIV APP 56, 6 P.3d 1072.

¶ 78 This holding is consistent with the standard of proof applicable to subsequent stages where "clear and convincing" or even the "beyond a reasonable doubt" standards apply. In addition, use of the "clear and convincing" standard will foster the policy of the FICWA and the preferences stated therein and will assist with the effort to avoid inadvertent interjection of cultural bias into the proceeding.[28]

### iv. An Additional Factor

¶ 79 The Oklahoma Act adds the additional requirement to utilize the Indian Tribe's services "to the maximum extent possible" in securing placement. 10 O.S. Supp.2000, § 40.6; *In re N.L.*, 1988 OK 39 at ¶¶ 36–38, 754 P.2d at 870. The services of Nation were not utilized at all, so an inquiry here must also consider whether the failure to utilize the services constitutes error.[29] This, in turn, necessitates a determination of whether, under the facts, the requirement applies.

¶ 80 Section 40.6 states, in part:

In all placements of an Indian child by the Oklahoma Department of Human Services (DHS), *or by any person* or other placement agency, DHS, *the person* or placement agency shall utilize to the maximum extent possible the services of the Indian tribe of the child in securing placement consistent with the provisions of the Oklahoma Indian Child Welfare Act. (Emphasis added.)

¶ 81 Mother testified that she had two prior children and had asked the Choctaw officials for assistance. She testified that she was informed that she had to reside within a certain area to receive assistance. Thus, according to her, when she learned she was pregnant with the Child in this case, she did not seek assistance believing it would be a futile effort, but contacted one of the attorneys appearing in this matter for Adoptive Parents and met Adoptive Parents through that contact.

¶ 82 This Court holds that *every* attorney involved in matters concerning Indian children subject to the Indian Child Welfare Acts is under an affirmative duty to insure full and complete compliance with these Acts. This Court recognizes that an attorney who is *solely* an advocate for prospective adoptive parents may, in the course of that advocacy, argue that good cause and the best interest of the child favor the adoptive parents. However, this Court further holds that this same attorney, while acting solely as an advocate for prospective adoptive parents, qualifies as "any person" under Section 40.6, when the attorney becomes involved to the extent of being an intermediary between a parent and prospective adoptive parents and then participating in legal proceedings leading to placement of the Indian child.[30] Moreover, counsel for Adoptive Parents received support money from Father for the benefit of the Child after the Child's birth.

¶ 83 This conclusion follows first from the strong policy of the Indian Child Welfare Acts to involve and protect tribal interests. It also follows from those cases such as *In re Adoption of Halloway* which guard against indirect obstacles to the accomplishment of the purposes and policies of the Acts. There, an Indian child apparently abandoned by its mother, was moved by an aunt from the Reservation for the purpose of changing

---

**28.** This holding is consistent with the Oklahoma Supreme Court's reliance on the Montana Court and the language of the concurring Opinion of *In re N.L.* concerning the standard of proof to show good cause to reject transfer to a Tribal Court. *See* B. Atwood, *Flashpoints Under The Indian Child Welfare Act: Toward a New Understanding of State Court Resistance*, 51 Emory L.J. 587, 661 (2002).

**29.** Nation's issue, as briefed, is slightly different in that Nation argues error from not following the statutory preferences when it was shown that the Tribe had services available. In this Court's view the issue, under the facts presented, exam-

ines how compliance with Section 40.6 interacts with the "good cause" determination.

**30.** Making an attorney responsible is not without precedent. The Fair Debt Collection Practices Act was held applicable to attorneys regularly engaged in consumer debt-collection litigation on behalf of a creditor client even though not expressly included. *Heintz v. Jenkins*, 514 U.S. 291, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995). The Court reasoned that a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a debt collector for purposes of the Act.

domicile so as to avoid application of the federal Act. Under Utah law, all steps necessary to change domicile had occurred. *Id.,* 732 P.2d at 968–69. Nevertheless, the Utah Supreme Court ruled in favor of the Navajo Nation, finding that the policies and purposes of the Act were paramount.

¶ 84 Thus, this Court further holds that finding of compliance with Section 40.6 is an element of the "good cause" inquiry. Here, compliance has not occurred.

### CONCLUSION

¶ 85 The notices here are defective and do not pass muster. While Nation may not have been prejudiced, Nation and Father can challenge the proceedings, including the notice to Father. The termination of Father's parental rights was essentially a default judgment, and does not purport to deal with or touch upon any of the issues of Indian law applicable here.

¶ 86 Next, the trial court has not, by its order, delved into the issues and made the requisite determinations concerning placement issues. Initially, it cannot be said from a review that the trial court correctly placed the burden of proof or applied the correct standard of proof with respect to the placement decision. Also, the evidence presented by the Adoptive Parents failed to meet the "qualified expert" requirements of the Acts.

¶ 87 The trial court's order denying the motions to vacate and denying the motion for different placement preferences is reversed. The order terminating Father's parental rights is vacated. This matter is remanded to the trial court for the purpose of determining, after proper notice, whether Father's parental rights should be terminated and to determine, based upon the rulings made by this Court, what appropriate placement should occur for the Child or whether, if the Nation should request, that the matter should be transferred to the Tribal Court of the Nation.

¶ 88 REVERSED AND REMANDED WITH INSTRUCTIONS.

COLBERT, P.J., concurs, and GOODMAN, J., dissents.

GOODMAN, J., dissenting:

¶ 1 I respectfully dissent to the majority's statutory interpretation. Further, I dissent to the majority's imposition of an additional, ambiguous, and unspecified duty on an attorney to follow the requirements of the state and federal Indian Child Welfare Acts when the attorney is already under a sworn duty to abide by all laws applicable in this state, which presumably includes all Indian Child Welfare Acts. The majority states that making an attorney responsible to follow all Indian Child Welfare Acts is analogous to the duty imposed on an attorney to follow the Fair Debt Collection Act. I respectfully disagree. The Fair Debt Collection Act applies to an attorney who presumably is no longer an advocate for his client because he is now trying to collect a debt from the client, and thus is now in the relationship of a creditor to the client. This differs from an attorney who is always in an attorney-client relationship with a potential adoptive parent and is never in an adversarial position to that client.