959 So.2d 761 (2007)
SEMINOLE TRIBE OF FLORIDA, a federally recognized Indian tribe, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES and Guardian Ad Litem Program, Appellees.
No. 4D06-3212.
District Court of Appeal of Florida, Fourth District.
May 30, 2007.
Rehearing Denied August 2, 2007.
*762 Donald A. Orlovsky of Kamen & Orlovsky, P.A., West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Jeffrey P. Bassett, Assistant Attorney General, Fort Lauderdale, for Appellee-Department of Children and Families.
Wendie Michelle Cooper, Orlando, for Appellee-Guardian Ad Litem.
STONE, J.
The Seminole Tribe of Florida (the tribe) appeals an order denying its motion to place K.D., a four-year-old child, pursuant to the Indian Child Welfare Act, 25 U.S.C. § 1901, et seq. (ICWA).
The tribe asserts that the trial court order disregards or misunderstands the mandates of the ICWA by failing to begin with a presumption in favor of the tribe's preference. We affirm.
K.D. was born prematurely to a Sioux mother who was registered with the tribe. He tested positive for cocaine at birth and was adjudicated dependent. He was placed in a medically licensed foster home in August 2002, with goals of long-term relative care and reunification with the mother. Because of his premature birth, K.D. had stringent medical needs. He was diagnosed with chronic lung disease/bronchopulmonary dysplasia (BPD) secondary to respiratory distress syndrome, atrial septal defect, retinopathy of prematurity, gastroesophageal reflux (GER), and vocal chord paralysis. Over time, his medical condition showed improvement. In subsequent stages of review, the goal remained reunification.
In late 2004, P.D., a registered Seminole, was confirmed to be K.D.'s father, and, as ICWA was implicated, notice to the tribe was given and the tribe intervened.
In December 2005, upon the mother's substance abuse relapse, the department moved to change the case plan from reunification to long term non-relative care with the foster parents who had cared for him since infancy. Less than two months later, the Seminole Tribe filed its motion to place K.D. pursuant to ICWA.
*763 In the motion, the tribe explains its original support for reunification with K.D.'s Native American mother, which it withdrew when she relapsed in mid-September 2005. Upon that occurrence, the "[t]ribe informed all parties that the Tribal Council would consider whether or not to find a Tribal, permanent family for [K.D.]." The tribe made its decision to place K.D. in a tribal family in mid-December, and K.D.'s mother supported his placement within the tribe. The tribe also suggested that a permanent decision at this juncture was premature and ran contrary to ICWA's provisions. The tribe posited that re-visiting permanency after K.D. had spent six months with his tribal family would be a better plan.
After several hearings, and in a fourteen-page order, the trial court found, by clear and convincing evidence, that it considered "all relevant grounds" listed in Florida Statute Chapter 39; ICWA, 25 U.S.C. § 1901 et seq., and particularly, § 1915. Placement of Indian Children (b) Foster Care or preadoptive placements; criteria; preferences[1]; and the BIA Guidelines, to deviate from the placement preferences in § 1915: F.3. Good Cause to Modify Preferences.[2]
The trial court also considered case law from different states in finding that the Guardian Ad Litem program, joined by the Department of Children and Family Services, had met its burden to overcome the presumption in favor of the tribe by clear and convincing evidence, as follows:
25. The decision made in the case is based on the above ICWA law along with the BIA Guidelines with regards to the specific facts of this case.
26. This Court is finding that the Guardian Ad Litem Program joined with the Department of Children and Families has shown by clear and convincing evidence as to a finding of good cause as to parts (ii) and (iii) of the BIA Guidelines regarding deviation from placement under ICWA law.
27. The Court finds that [K.D.] has extraordinary physical needs as evidenced by his numerous medical conditions and that a suitable family for placement meeting the preference criteria is unavailable.
28. While the "J Family" [the family put forward by the tribe] is an appropriate home for non-medically needed foster children (and the Court also notes: a wonderful, warm and loving family), *764 they are not a licensed medical foster home.
29. The Court finds by the testimony given, that the "J Family" is unaware of the extent of [K.D.]'s medical conditions. . . . [and is unprepared and untrained to deal with some of the medical needs]
* * *
32. Due to the "J Family's" lack of knowledge in the areas described above, and based on the testimony given during the hearing, the Court has concerns about the "J Family's" ability to know when [K.D.] is having a symptomatic day. . . .
33. The "Q Family's" [current foster parents] knowledge of [K.D.]'s medical conditions is due in large part to the amount of time [K.D.] has been with them. He has lived with them from the time he was eight months old until now; almost 4 years.
34. The Tribe intervened in [K.D.]'s case in January, 2005; over a year and a half ago. They never asked for his placement to be changed until this past January, 2006. The reason the Tribe gave was that they had no objection to his placement with the "Q Family" as [K.D.]'s mother was still working towards reunification and taking [K.D.] to tribal events. The Court find this argument lacking. This Court has been on this case since January, 2005. Since that time, the mother has had only supervised visits which she exercised sporadically. In fact, this Court had previously ruled last year that the mother could not have unsupervised visits with [K.D.] until she learned more about his medical conditions. She was not including [K.D.] in any Tribal functions or ceremonies. The Court is counting that time frame as time that the tribe could have been doing a diligent search for an appropriate Tribal placement.
35. The Court wants to make note that this decision is being made on the existing ICWA law and BIA Guidelines. The Court is not addressing the arguments made by the Guardian Ad Litem Program or the Department regarding the Best Interest's [sic] of the Child standard as an exception to the Federal law (which has not yet been decided on in Florida regarding Native American Children) as the Court is able to make it's [sic] decision by clear and convincing evidence based on the existing Federal law and BIA Guidelines.
In denying the tribe's motion, the trial court ruled that placement will remain with the "Q Family" under the goal of long term licensed care, but suggested that upon proper medical training and education for the "J Family," a visitation schedule be set up for K.D. to have contact with his extended family, if the "J Family" wishes to participate. The court also ordered that K.D. had a need to identify with his tribe and should be afforded every opportunity to do so and that the "Q Family" should make every effort to include K.D. in as many tribal functions and ceremonies as possible and as permitted.
It is apparent from a review of the order that it is founded on the unique medical needs of this child and the court's concern that the "J Family" was not sufficiently shown as able to meet those needs.
There is record evidence that although the child has outgrown some of his earlier problems, he continues to be affected by his condition. There was much testimony concerning the training and skills of the foster parents in meeting the child's special medical needs. There was testimony the current foster family had an advantage in dealing with his special needs because of their ability to recognize the onset of symptoms and in their ability to use a stethoscope to hear faint wheezing, their *765 ability to use a nebulizer, and their knowledge of K.D. based on the time spent with K.D.
There are no Florida cases governing application of ICWA under these circumstances, and other states are not even in agreement as to the standard of review when determining whether good cause exists to deviate from ICWA's placement preferences. In re Adoption of B.G.J., 281 Kan. 552, 133 P.3d 1 (2006) (noting the abuse of discretion review adopted by the supreme courts of Idaho, Alaska, and Arizona, the Kansas Supreme Court found this review to be similar to its substantial abuse of discretion test). The court of appeals in Iowa reviewed an ICWA placement case de novo. In re C.F., 690 N.W.2d 464, 2004 WL 1396159 (Iowa Ct. App.2004).
A hybrid of these approaches, which we deem reasonable,[3] is found in an Alaska case, Adoption of Sara J., 123 P.3d 1017, 1021 (Alaska 2005), to wit:
We review a finding of good cause to deviate from ICWA preferences for abuse of discretion. It would be an abuse of discretion for a superior court to consider improper factors or improperly weigh certain factors in making its determination. Determining whether the superior court's findings comport with the requirements of ICWA raises a question of law that we decide de novo. We review findings of fact for clear error. A factual finding is clearly erroneous when we are left with a definite and firm conviction that the trial court has made a mistake.
(Citations omitted)
Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), is a source of background about ICWA. It indicates that:
[t]he Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U.S.C. §§ 1901-1963, was the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes. . . .
Holyfield, 490 U.S. at 32, 109 S.Ct. at 1599-1600. In the statute itself, Congress adopted the point of view that tribes needed their children to survive as viable cultures, finding:
(5) that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.
25 U.S.C. § 1901.
Section 1915(b), dealing with preferences in placement of Indian children, is considered the "most important substantive requirement that the ICWA imposes on state courts." Tohono O'Odham Nation v. Superior Court of Fresno County, 2006 WL 3694534 at *14 (Cal.App. Dec.15, 2006). This section mandates preference be given, absent good cause to the contrary, to a member of the Indian child's extended family; a foster home licensed, approved, or specified by the Indian child's tribe; an Indian foster home licensed or approved by an authorized non-Indian licensing *766 authority; or an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.
In applying the act and guidelines, there is a presumption in favor of placement in line with ICWA's stated preferences. Clearly, ICWA involves competing interests  the best interests of an Indian child as considered in the overall community and the "extrapersonal context of best interests [referring] to the means, resources, and procedures available and used to preserve and protect the personal best interests of the children and to the Tribal and cultural interests specially involved." Adoption of Baby Girl B., 67 P.3d 359, 373 (Okla.Civ.App.2003) (emphasis in original). It is in this context that the trial court must evaluate whether there is good cause to deviate.
Congress did not define "good cause" within the statute, a failure that has been interpreted to mean that Congress "explicitly intended to provide state courts with flexibility in determining the placement of an Indian child." Tohono O'Odham Nation, 2006 WL 3694534 at *14. In the absence of an express definition of good cause, the Department of the Interior, through the Bureau of Indian Affairs (BIA), promulgated Guidelines for State Courts; Indian Child Custody Proceedings to assist in interpreting and applying the ICWA. In the matter of C.H., 299 Mont. 62, 997 P.2d 776, 780 (2000). While not binding on state courts, the guidelines are considered important. Liza A. v. Superior Court of Fresno County, 2004 WL 2095631 at *9 (Cal.App. 5 Dist. Sept.21, 2004). In pertinent part, the guidelines say,
a. For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference set out above shall be based on one or more of the following considerations:
(i) The request of the biological parents or the child when the child is of sufficient age.
(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.
(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.
b. The burden of establishing the existence of good cause not to follow the order of preferences established in subsection (b) shall be on the party urging that the preferences not be followed.
BIA Guidelines, F.3. (emphasis added) In this case, the trial court utilized the appropriate BIA guidelines in interpreting good cause as per section 1915(b), and correctly assigned the burden to the department and the Guardian Ad Litem.
Although the trial court order does not explicitly find that the tribal family cannot meet the child's needs, it is clear from review of the record that the trial court was concerned about the child's medical condition and weighed the ability of the competing families to meet those needs. We recognize, as did the trial court, that the "J Family" had many qualifications, including their willingness to be trained to meet the child's medical needs. Nevertheless, the trial court concluded, on disputed evidence, that the child's unique needs could not be met by the tribal family.
We cannot conclude that the trial court abused its discretion when the order reflects an understanding of the statutory scheme and there is evidence, albeit conflicting, that there was good cause to deviate from ICWA. We conclude that the trial court did not fail to properly apply ICWA *767 and implicit in the order is the court's conclusion that the tribal family cannot presently meet the child's unique needs. Therefore, the order is affirmed.
FARMER and MAY, JJ., concur.
NOTES
[1] Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to placement with: (i) a member of the Indian child's extended family; (ii) a foster home licensed, approved or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs. (All emphasis added by trial court)
[2] (a) For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference set out above shall be based on one or more of the following considerations: (i) The requests of the biological parents or the child when the child is of sufficient age; (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness; (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference.
[3] We do not adopt Alaska's "clearly erroneous" standard of reviewing fact findings, choosing to apply Florida's abuse of discretion standard to the review of a trial court's finding of good cause to deviate.