IN RE INTEREST OF CARMELITA MADONNA BIRD HEAD, A
MINOR CHILD.
STATE OF NEBRASKA, APPELLEE, V. ALVA BIRD HEAD
RATTLING CHASE, APPELLANT.

331 N.W.2d 785

Filed March 18, 1983. No. 82-197.

Susan I. Buckles and Joe Louie Romero of Western Nebraska Legal Services, for appellant.

Dennis D. King and Terrance O. Waite, and Michael T. Varn, guardian ad litem, for appellee.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, WHITE, HASTINGS, and CAPORALE, JJ., and COLWELL, D.J., Retired.

MCCOWN, J.

This is a proceeding to declare an Indian infant a neglected and dependent child and to terminate parental rights. The county court of Sheridan County, acting in its capacity as a juvenile court, found Carmelita Madonna Bird Head to be a neglected and dependent child, terminated parental rights, placed custody of the child in the Nebraska Department of Public Welfare to be placed for adoption, and directed that temporary custody of the child should be continued in the foster parents previously designated by the Department of Public Welfare. Alva

Bird Head Rattling Chase, the child's maternal aunt, appealed to the District Court, which affirmed the judgment of the county court. The aunt has again appealed.

Carmelita Madonna Bird Head was born on September 3, 1979. Following the birth of the child her mother, Martha Bird Head, and the child resided with the mother's uncle, Thomas Plenty Wounds in Gordon, Nebraska. The residence periodically also served as a temporary residence for several other individuals, including Alva Bird Head Rattling Chase, a sister of Martha Bird Head. On many occasions, and for extensive periods of time before July 31, 1980, her mother had left the child in the care of Patricia and Delmer Dunnick of Rushville, Nebraska. Martha Bird Head died on July 31, 1980, in Denver, Colorado, shortly after being taken to the hospital.

Between July 31, 1980, and August 12, 1980, the child was in the care of her aunt, Alva Bird Head Rattling Chase, or Patricia and Delmer Dunnick. The child had been left at the residence of Thomas Plenty Wounds in Gordon, Nebraska, when her mother went to the hospital. On August 12, 1980, the child was taken into custody by the sheriff and a welfare worker. The sheriff delivered the child into the temporary custody of the Sheridan County Welfare Department, which placed her in the temporary care of Patricia and Delmer Dunnick.

On August 15, 1980, a petition was filed seeking to have the child declared to be neglected and dependent as described in Neb. Rev. Stat. § 43-202(1) (Reissue 1978), and seeking the termination of the parental rights of any natural father.

Two men listed by the mother on two different ADC applications as the father of the child were notified of the proceeding, neither of whom appeared. The former husband of Martha Bird Head, Fred Tail, was also notified. He appeared through counsel but later withdrew. Notice was also given to

the tribal prosecutor of the Oglala Sioux Tribe in Pine Ridge, South Dakota.

The appellant aunt, Alva Bird Head Rattling Chase, did not personally appear at the first hearing on September 3, 1980, but did appear by counsel. Following hearing, the court ordered that the Oglala Sioux Tribal Court be given notice of the proceeding, appointed a guardian ad litem for the minor child, continued temporary custody and care of the child in Patricia and Delmer Dunnick, and continued the proceeding.

On September 23, 1980, an adjudication hearing was held. The appellant was present and represented by counsel. Patricia and Delmer Dunnick were present and represented by counsel and the guardian ad litem for the child was also present. A motion requesting the court to transfer jurisdiction to the Oglala Sioux Tribal Court was made on behalf of Fred Tail by an individual who had no tribal authority to make such a motion.

The court noted that notice of the proceedings had been served on the tribal prosecutor of the Oglala Sioux Tribe and that the prosecutor had not appeared in the proceedings or authorized anyone else to appear on his behalf, and no appearance had been made on behalf of the tribe, the tribal juvenile court, the tribal prosecutor's office, or any other party who might be authorized to appear on behalf of the tribe, and that consideration of any such motion was premature.

The court then proceeded with the adjudication hearing and found that Carmelita Bird Head was a child described in § 43-202(1) and (2) and took under advisement the termination of parental rights. The court further found that the adjudication hearing did not preclude interested parties from addressing the issue of the court's jurisdiction pursuant to the Indian Child Welfare Act of 1978. The court therefore ordered the matter continued until October 31, 1980, for a hearing on motions which might be filed per-

taining to whether the matter should be transferred to the Oglala Sioux Tribal Court for further proceedings. The court directed that any such motions should be filed on or before October 16, 1980, and briefs in support or in opposition on or before October 26, 1980.

On October 18, 1980, a petition for transfer of the proceedings to the Oglala Sioux juvenile court was filed, signed by a judge of the tribal court. Objection was made on the ground of late filing. On October 30, 1980, the court accepted the filing and continued the hearing upon the petition to transfer proceedings to November 25, 1980.

On November 25, 1980, hearing on the petition to transfer jurisdiction to the tribal court was held as scheduled. No representative of the Oglala Sioux Tribe or of the tribal court was present to argue the motion or present evidence. The guardian ad litem and Patricia and Delmer Dunnick had filed objections to the petition.

Hearing was held and argument had. There was no evidence that the petition for transfer had been authorized by the tribe. The court apparently determined that the petition for transfer was unauthorized by the tribe or had been declined by the tribal court. The court found that the petition was deemed to have been abandoned and good cause had been shown by the evidence why the transfer should not be ordered. The court therefore denied the transfer and set the date for dispositional hearing. Neither the Oglala Sioux Tribe nor the tribal court appealed from the order, and neither has taken any further part in these proceedings.

A dispositional hearing was held on January 9, 1981. Evidence was submitted and the court found that the mother of the child was deceased and that the father of the child was unknown and had abandoned the child for more than 6 months, and that the child should be placed for adoption. The court therefore terminated the parental rights of any po-

tential father and ordered custody of the child placed with the Nebraska Department of Public Welfare to be placed for adoption by that agency, and continued temporary custody in Patricia and Delmer Dunnick pending further disposition by the Department of Public Welfare.

Alva Bird Head Rattling Chase appealed to the District Court. After extensive delays involving the right to proceed in forma pauperis and problems of preparation and completion of the bill of exceptions from the county court, the District Court received the bill of exceptions and some additional documentary evidence and took the case under advisement on February 2, 1982.

On February 16, 1982, the District Court found that the appellant's history of criminal conduct, her use of alcohol and resulting intoxication, and the apparent abuse of the child while in her care established that she was unfit to have custody. The District Court also found that the tribe and the tribal court had abandoned the motion to transfer jurisdiction and that the appellant was not an Indian custodian under the Indian Child Welfare Act. The District Court affirmed the judgment of the county court and this appeal followed.

The issues on this appeal revolve around the application of the Indian Child Welfare Act. 25 U.S.C.A. §§ 1901 et seq. (1983). The national policy undergirding the Indian Child Welfare Act is to protect the best interests of Indian children by the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture. See 25 U.S.C.A. § 1902.

The appellant first contends that she was an Indian custodian within the meaning of that act and that as such a custodian she is entitled to certain procedural and substantive rights similar to the rights of parents, including the right to petition to transfer to a tribal court.

25 U.S.C.A. § 1903 defines "Indian custodian" as

"any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child."

The evidence in the record here shows that before the sheriff took Carmelita into custody the child had spent a major part of her lifetime in the custody of the Dunnicks, who had been chosen to care for her by her mother. After the mother's death, and before the sheriff took custody, the child was in the possession of the appellant aunt for less than 1 week. The remainder of that time the child spent with the Dunnicks, with the approval of the appellant.

The appellant, at the dispositional hearing, admitted that she had a severe alcohol problem and that she had been convicted of more than ten misdemeanors and was on probation following her conviction for felonious entry of a building. There was also testimony as to bruises found on Carmelita's back when the child was taken from the appellant's possession by the sheriff.

No evidence was presented to indicate that the child's mother ever transferred temporary care or custody of the child to the appellant or intended for her to have custody of the child. The evidence indicates that the mother was taken from the residence to the hospital, suffering an overdose of drugs, and that she took no actions at all with reference to the care or custody of the child. The evidence fails to indicate that the mother ever transferred, attempted to transfer, or intended to transfer temporary physical care, custody, and control of the child to the appellant or anyone else at the time the mother was taken to the hospital.

The evidence in the record supports the findings of the District Court that the appellant was not an Indian custodian within the meaning of 25 U.S.C.A. § 1903, and that the appellant was unfit to have custody of the child.

The appellant next contends that the county court erred in failing to transfer the proceedings from the county court to the tribal court.

25 U.S.C.A. § 1911(b) provides: "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided,* That such transfer shall be subject to declination by the tribal court of such tribe."

In the present case the only petition for transfer of proceedings which is involved here was filed on October 18, 1980, by a juvenile judge of the Oglala Sioux Tribal Court. Hearing was set and objections to the filing and answers to the petition, alleging good cause for denial, were filed.

Neither the Oglala Sioux Tribe nor the tribal court nor any representative of either appeared at the time set for hearing, and there was no evidence that the petition had been authorized by the tribe or the proceedings accepted or approved by the tribal court. The trial court, after hearing, found that the proceedings had been abandoned and good cause for denial shown, and denied the transfer. The validity of the finding of abandonment is further established by the fact that neither the tribe nor the tribal court nor any representative of either appealed from the order, and neither has taken any further part in these proceedings.

There was ample evidence at the hearing to establish good cause for denial of the transfer. The minor child resided in Sheridan County, Nebraska, and not on the reservation. Virtually all the witnesses, including the appellant, also resided in Sheridan County, Nebraska. The reservation and the tribal court are located in South Dakota. Wit-

nesses also testified as to problems existing in the placement of Indian children on the reservation.

The record supports a determination that the petition was unauthorized and the transfer declined, and the finding that the proceedings had been abandoned and that good cause existed for denying the transfer.

Finally, the appellant contends that the court erred in failing to follow the preferential preadoptive placement provisions of the Indian Child Welfare Act, or to make any findings as to good cause for not doing so.

25 U.S.C.A. § 1903(1)(iii) provides that " 'preadoptive placement' . . . shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement."

25 U.S.C.A. § 1915(b) provides: "Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

"(i) a member of the Indian child's extended family;

"(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

"(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

"(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."

In this case a second cousin of the child, Severt Young Bear, testified at the dispositional hearing and offered to take custody of the child. He was an extended family member under the provisions of 25

U.S.C.A. § 1903(2). Young Bear testified that there were other extended family members who would take the child but were unable to attend the hearing. There was also testimony by another witness that Young Bear's home could be certified as a foster home by the tribe within a week's time. There was also evidence that there were several Indian foster homes available which were licensed by the state or by the Bureau of Indian Affairs. There was also testimony by a witness that she maintained an Indian foster home in Sheridan County, Nebraska, which was licensed by both the State of Nebraska and by the Bureau of Indian Affairs.

The evidence therefore reflects that there were several possible placements which had a statutory preference over placement with the Department of Public Welfare or the Dunnicks. Although there was evidence that Patricia Dunnick was of partial Indian blood, the Dunnicks have no statutory claim of preference under 25 U.S.C.A. § 1915(b). The only evidence is that the Dunnicks are fit and proper persons to have custody of the child, but there is no finding by the county court to that effect, nor a finding as to their fitness compared to the fitness of the statutorily preferred individuals.

The Indian Child Welfare Act does not require a state court to make a child placement with a statutorily preferred person or agency. It requires only that a preference shall be given to such a person or agency in the absence of good cause to the contrary. While there may well be good cause for not complying with the statutory order of preference in the present case, the only direct finding which the court made as to any specific preferred person was the finding that the appellant was unfit to have custody of the child. The evidence supporting that finding constituted good cause as to the appellant, but the evidence is uncertain and no finding was made by either the county court or the District Court as to good cause for failing to comply with the statutory

order of preference as to the other statutorily preferred individuals or agencies.

The importance of the evidence and record as to good cause is illustrated by other portions of the preference statute. 25 U.S.C.A. § 1915(d) and (e) provides: "(d) The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties.

"(e) A record of each such placement, under State law, of an Indian child shall be maintained by the State in which the placement was made, evidencing the efforts to comply with the order of preference specified in this section. Such record shall be made available at any time upon the request of the Secretary or the Indian child's tribe."

The Indian Child Welfare Act does not change the cardinal rule that the best interests of the child are paramount, although it may alter its focus. The legislative history of the act states explicitly that the use of the term "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child. Factual support in the record in the trial court as to "good cause" for failure to comply with statutory child placement preference directives are necessary for appropriate appellate review.

The record in this case is devoid of any findings by the county court as to what good cause was shown to warrant a failure to give statutorily specified preference to persons or agencies, other than the appellant, designated in 25 U.S.C.A. § 1915(b). The matter must, therefore, be remanded for further proceedings on that issue.

That portion of the order of the county court dated January 16, 1981, placing the minor child with the Nebraska Department of Public Welfare for adop-

tion is vacated and the cause is remanded for further proceedings with respect to preadoptive placement in accordance with this opinion. The termination of parental rights is affirmed. Temporary custody of the child is continued in Patricia and Delmer Dunnick pending a final order on disposition.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS FOR
FURTHER PROCEEDINGS.

KRIVOSHA, C.J., concurring.

I concur in the result reached by the majority in this case. I believe, however, that we are in error in suggesting that the trial court was correct in finding that the petition to transfer was "abandoned." There is no way in which the tribal court may, under the specific provisions of the Indian Child Welfare Act, 25 U.S.C.A. § 1911(b) (1983), "abandon" the proceedings contemplated by the act. Under the provisions of the federal code, if either a parent of an Indian child or the Indian custodian or the Indian child's tribe petitions the state court to transfer the proceedings, the state court is obligated to transfer the proceedings unless either parent objects or good cause is shown why such transfer should not be made. Neither the parent nor the Indian custodian nor the Indian child's tribe has any further duties or obligations once the petition is filed. Absent an objection or proof why the transfer should not occur, the transfer is obligatory unless the tribal court declines the transfer. The act grants to the tribal court of such tribe the authority to decline the transfer but does not extend that right to anyone else authorized to file a petition. It is clear from reading the code that the entity authorized to decline the transfer, to wit, the tribal court, is not the same entity authorized to petition for the transfer. To therefore suggest that the tribal court abandoned the proceedings because one of the parties purporting to petition for the transfer failed to appear when no one is required to appear is to simply read something

into the act which does not exist. The tribal court has no obligation to do anything except receive the transfer unless it affirmatively takes action to decline. Its inaction, absent a requirement to perform any positive act, cannot and should not be deemed to be an abandonment.

WHITE and CAPORALE, JJ., join in this concurrence.

COLWELL, D.J., Retired, dissenting.

I respectfully dissent.

It would appear that the appellant in this case lacks standing to raise questions concerning the possible rights of others to the custody of Carmelita, a nonreservation Indian child under the Indian Child Welfare Act. It is noted that no other person has filed a notice of appeal.

I disagree with the majority opinion that assumes the constitutionality of the Indian Child Welfare Act and its directives to our courts on procedure and subject matter. The act is an attempt to invade a primary power and duty of the State of Nebraska to protect the rights and best interests of children reserved to it by article X of the Constitution of the United States.

Some of the objectionable parts of the act are:

Section 1912: "(d) Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

Section 1915: "(a) In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

"(b) Any child accepted for foster care or preadoptive placement shall be placed in the least re-

strictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

"(i) a member of the Indian child's extended family;

"(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

"(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

"(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

"(c) In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section. . . .

"(d) The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties."

At the time the law was under consideration by the Congress, the U.S. Department of Justice advised there were serious constitutional questions concerning the act. In a letter to the committee chairman it was stated: "A third and more serious constitutional question is, we think, raised by section 102 of the House draft. That section, taken together with sections 103 and 104, deals generally with the

handling of custody proceedings involving Indian children by State courts. Section 102 establishes a fairly detailed set of procedures and substantive standards which State courts would be required to follow in adjudicating the placement of an Indian child as defined by section 4(4) of the House draft.

"As we understand section 102, it would, for example, impose these detailed procedures on a New York State court sitting in Manhattan where that court was adjudicating the custody of an Indian child and even though the procedures otherwise applicable in this State court proceeding were constitutionally sufficient. While we think that Congress might impose such requirments [sic] on State courts exercising jurisdiction over reservation Indians pursuant to Public Law 83-280, we are not convinced that Congress' power to control the incidents of such litigation involving nonreservation Indian children and parents pursuant to the Indian commerce clause is sufficient to override the significant State interest in regulating the procedure to be followed by its courts in exercising State jurisdiction over what is a traditionally State matter. It seems to us that the Federal interest in the off-reservation context is so attenuated that the 10th Amendment and general principles of federalism preclude the wholesale invasion of State power contemplated by section 102. See Hart, 'The Relations Between State and Federal Law,' 54 Colum. L. Rev. 489, 508 (1954)." 1978 U.S. Code Cong. & Ad. News 7561, 7562-63.

The Recommended Guidelines for State Courts-Indian Child Custody Proceedings, 44 Fed. Reg. 24,000 at 24,002 (1979), states in part: "For purposes of any such foster care, preadoptive, or adoptive placement, a determination of good cause to the contrary for such placement in accord with the preferences set out above should consider:

"(1) the requests of the biological parents, or the child when the child is of sufficient age."

It is of some significance in this case that the mother of the child, "on many occasions and for extensive periods of time," left the child in the care of the Dunnicks, the parties who have temporary custody of the child. The child has spent a major part of her lifetime in the care of the Dunnicks, who were chosen by the mother to care for the child.

I would affirm.

BOSLAUGH, J., joins in this dissent.