is not supported by competent evidence. We therefore reverse that portion of the district court's order affirming this finding, with directions to the district court to remand the cause to the county court with directions to reverse and vacate that portion of the order.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

———————————

IN RE INTEREST OF NERY V. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. MARIO V., SR.,
AND IDA V., APPELLEES, AND ROSEBUD SIOUX
TRIBE, INTERVENOR-APPELLANT.

___ N.W.2d ___

Filed June 9, 2015.    No. A-14-654.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings.
2. **____: ____.** An appellate court reviews questions of law independently of the juvenile court's conclusions.
3. **Indian Child Welfare Act.** The substantive portions of the Indian Child Welfare Act and the corresponding portions of the Nebraska Indian Child Welfare Act provide heightened protection to the rights of Indian parents, tribes, and children in proceedings involving custody, termination, and adoption.
4. **Juvenile Courts: Evidence: Proof.** In adjudication cases, the standard of proof for the active efforts element in Neb. Rev. Stat. § 43-1505(4) (Reissue 2008) is proof by a preponderance of the evidence.

Appeal from the County Court for Hall County: PHILIP M. MARTIN, JR., Judge. Affirmed.

Lloyd E. Guy III for intervenor-appellant.

Megan Alexander, Deputy Hall County Attorney, for appellee State of Nebraska.

Susan M. Koenig, of Mayer, Burns, Koenig & Janulewicz, guardian ad litem.

MOORE, Chief Judge, and INBODY and PIRTLE, Judges.

INBODY, Judge.

## INTRODUCTION

The Rosebud Sioux Tribe (Tribe), an intervenor in this case, appeals the order of the county court for Hall County, sitting as a separate juvenile court, denying the Tribe's motion for a change of placement of three minor children, Mario V. (Mario Jr.), Esperanza V., and Nery V. For the reasons that follow, we affirm the order of the trial court finding that the State met its burden of proof in showing that there was good cause to deviate from the placement requirements of the Nebraska Indian Child Welfare Act (NICWA).

## STATEMENT OF FACTS

*Background Information.*

Mario Jr., Esperanza, and Nery were removed from their parents' care in November 2010. At the time of the children's removal, their biological mother, Ida V., requested that the children be placed with Tara L. and Terry L., which request was granted without objection from any party. Ida has ties to the Rosebud Sioux Tribe and requested placement with Tara and Terry even though they are not Native American. The Tribe intervened in this case in January 2011, and the Tribe has been aware during the pendency of the case that the children are placed in a non-Native American foster home.

In October 2013, the Tribe filed a motion to change the placement of all three children, asserting that Ida no longer consented to a non-Native American placement and requesting that the children be placed with their maternal aunt, Brianna C., who is an enrolled member of the Tribe. Thereafter, Ida filed with the trial court a "Withdrawal of Consent to Placement in Non-Indian Home." The Nebraska Department of Health and Human Services (DHHS) filed an objection to the change of placement for the reasons that the children had been placed with Tara and Terry for 3 years; that Brianna had been previously suggested for placement, but that on three separate occasions, home studies were completed, none of which recommended placement with her; that the Tribe had been involved

in the case since 2010 and had failed to inquire about placement; and that a new placement would traumatize the children and was not in their best interests.

*Hearing on Motion to*
*Change Placement.*

The hearing on the motion to change placement was held over several days from January through May 2014. The Tribe adduced testimony from several witnesses. Brianna testified that she was the children's aunt and also an enrolled member of the Tribe. At that time, Brianna was 27 years old; lived in Kearney, Nebraska, with her 5-year-old daughter; and was employed by a sports medicine clinic as a "CNA, med aide." Brianna also has a pharmacy technician's license and has received her certification to volunteer as a court-appointed special advocate. Brianna testified about the importance of being such an advocate and her involvement with that work, but later testified that she had worked on only one case and did not know if she had been terminated from the advocate program, since she had moved from Grand Island, Nebraska, to Kearney without giving notice. Brianna testified that she had been employed at seven different places in the last 7 years. Brianna's current home has three bedrooms and two bathrooms.

Brianna explained that on three separate occasions, DHHS had completed home studies at her residence, and that she had been denied authorization as a placement each time. Brianna has not seen any of Ida's children since they were first taken from Ida's home and had only recently attempted to have visitation with them in November 2013. Brianna testified that her involvement with the Tribe included having her federal identification card from the Lakota Sioux Tribe and taking her daughter to a Tribe powwow in 2013. Other than those two instances, Brianna testified she had very little involvement with the Tribe, limited to talking to her daughter about her ancestors and buying a compact disc of "Indian music" to listen to.

The Tribe adduced testimony from Lorna Turgeon. Turgeon testified that she is an enrolled member of the Rosebud

Sioux Tribe; she obtained her undergraduate degree from Metropolitan State University in St. Paul, Minnesota; and she obtained master of social work and master of public administration degrees from the University of Nebraska at Omaha. Turgeon testified that she had more than 20 years of experience in working with children and was certified as an expert in Indian child welfare. Turgeon testified about the importance of the extended family in the Indian culture.

Turgeon became involved in this particular case in September 2013. A home study commissioned by the Tribe was completed in October 2013 and is based upon interviews with Brianna. Turgeon testified that the recommendation of that home study was for placement of the three children with Brianna. The recommendation was based on aspects of the home study including child safety, nurturance, Brianna's being able to provide for the children financially and being able to create a safe and loving home for them, and the fact that the children "would retain their cultural identity and sense of belonging within their culture and their family." However, Turgeon testified that in compiling the home study, she did not meet with the children's foster parents, did not know how much contact with Native American culture the children had been exposed to in their lives, and did not know what, if anything, the foster parents have done to help the children retain any Native American culture. Turgeon had also not reviewed any of the DHHS case files for the family, including the home studies DHHS completed.

The Tribe's home study explains that in the Lakota family structure, a biological mother's sister is considered the children's "other mother." The home study indicates that prior to the children's being removed, Brianna was involved in the children's lives. The home study indicates that Brianna was aware of the trauma continued moving causes the children and that she could be "therapeutic" for the children by making the children feel secure. The home study indicates that Brianna supports contact with the children's parents and that she feels that she can control Ida when she gets mad or upset. The Tribe's home study indicates that Brianna is very involved in her Native American culture and mentions several times

that Brianna is also very involved as a court-appointed special advocate volunteer.

The Tribe's home study included a home safety checklist indicating the process involved in the study. The checklist includes whether the worker involved in the study contacted a minimum of three references, completed "[g]enograms" and "[e]co [m]aps," investigated Brianna's transportation, and verified her driver's license and whether Brianna met housing requirements. The checklist indicates that Brianna had no automobile insurance and that no screening for abuse and neglect or criminal background check had been completed. Turgeon acknowledged that the minor children were happy in their current foster placement and admitted that it was possible that the children could live in a home that was neither Hispanic nor Native American but still retain the culture of one or both of those cultural identities.

Sherri Eveleth, a DHHS Indian child welfare program specialist, testified as an expert witness for the State and explained that she had been involved with this family and case since 2008. Eveleth testified that several attempts had been made with the family to place the children with family members, but that many of the family members lost contact or interest. Eveleth testified that the Tribe intervened in the case in January 2011, upon her request after finding out about the children's eligibility as enrolled members of the Tribe. Eveleth contacted the Tribe's caseworker, Shirley Bad Wound, about the children via telephone and in person. Eveleth testified that she specifically talked with Bad Wound about placement of the children with Native American families but was told that there were no families available for placement in the area or on the Rosebud Sioux reservation. Eveleth testified that placement of the children with Brianna would result in serious emotional harm to the children. Eveleth testified that Brianna did not act to protect the children despite knowing the children were in the care of Ida, who was actively using methamphetamine, and that Brianna's courtroom testimony indicated she was capable of being very hostile.

Christina Ledesma, the ongoing DHHS case manager, was assigned to the case from November 2010 to September 2012.

During that time, the children remained in the same placement with Tara and Terry. Ledesma testified that several home studies were completed for family members who expressed an interest in placement of the children with them, including Brianna. Ledesma testified that several of the interested family members lost touch with DHHS or did not complete the placement information. Ledesma testified that in 2008, Brianna had a home study which did not recommend placement of the children with her. A second home study was completed in 2011, which also did not recommend placement of the children with Brianna. Ledesma explained that all of the children were high-needs children with mental health diagnoses and trust issues. DHHS was concerned with Brianna's employment stability and her ability to be a single parent to not only her own daughter, but also to the three minor children at issue. There was also concern that Brianna would not be able to stand up to Ida and set healthy boundaries for the children. Ledesma testified that the Tribe was aware that the children were placed in a non-Native American home and did not make any objection to said placement for several years. Ledesma further testified that the caseworker for the Tribe, Bad Wound, did not have any placement options for the children.

The current DHHS caseworker, Marjorie L. Creason, testified that she was assigned to this case in 2012. Creason testified that Mario Jr., prior to his current placement, had been placed in six or seven homes and that Esperanza had been in three different foster home placements. Creason testified that she meets with the children during her monthly visits and team meetings and that they are all excelling in school and involved in several activities. Creason testified that the children are very social and have bonded with Tara and Terry. Creason testified that based on the home studies, she would not feel comfortable about placing the children with Brianna, and that due to the amount of time they have been placed with Tara and Terry, a change in placement was not in the children's best interests.

In 2011, Joan Ramsey, a licensed professional counselor, was hired by DHHS to conduct a home study of Brianna.

Ramsey testified that in completing home studies, she looks at the individuals' family of origin, relationships with their own parents and siblings, mental health history, substance abuse issues, contacts with the law, social problems, financial and employment history, relationship with their biological children, and parenting style and the effect on foster children in the home.

In 2011, Brianna was living with her daughter in a small one-bedroom apartment, in a neighborhood where there were safety concerns. Brianna was employed as a "CNA" working from 2 to 10 p.m. and planned on placing the children in daycare during those hours. Ramsey was concerned because Brianna believed she could adequately parent all four children on her own while working full time and also considering attending school. Ramsey was also concerned because of Brianna's instability with frequently changing jobs, which also raised financial concerns. Ramsey testified that Brianna was not financially self-sufficient and had no health insurance. Ramsey was also concerned with Brianna's ability to set boundaries with Ida. On the positive side, Ramsey testified that all of Brianna's references indicated that Brianna loved children, was a good parent to her own daughter, and loved Ida's children as well. Ramsey did not recommend that the children be placed with Brianna based upon the home study.

In 2013, Ramsey completed the third home study for Brianna. At that time, Brianna had moved to Kearney and was living in a larger trailer home, with three bedrooms, two bathrooms, and a small yard. Brianna indicated that at her new employment, she worked three 12-hour shifts over each weekend and would place the children in daycare during that time. Ramsey testified that Brianna's financial position had improved but that she was still concerned Brianna was unrealistic about parenting the children. Ramsey testified that two of the three children are high needs with diagnoses of dysthymic disorder and reactive attachment disorder, the latter of which requires routine, structure, and very little change for a child. Ramsey also testified that any deviation could result in stress and emotional issues for the children. Ramsey testified that Brianna had not done any research or planning

and did not have any support for the transition of the children. Further, Ramsey had difficulty keeping in contact with Brianna, which raised concern in that Brianna would need to keep in constant contact with schools, therapists, doctors, and caseworkers.

Ramsey testified that similarly to her conclusions in 2011, she did not recommend placement of the children with Brianna. Ramsey emphasized that the children had been in placement with Tara and Terry for a significant amount of time and were very bonded with that family. Ramsey, after speaking with caseworkers and therapists, was concerned that any movement of the children would cause significant harm and set the children back in their development.

The children's foster mother, Tara, testified that she first had contact with the children's biological family in 2008, when Mario Jr. and Esperanza were placed with her and her husband, Terry, for approximately 9 months. Tara lost track of the children until 2010, when she saw them at a local restaurant. At that time, Tara kept in touch with the family and had many conversations with Ida. Tara testified that in November 2010, Ida called her and was very upset because the State had taken the children into custody. Ida asked Tara if she would go to DHHS and get the children. Tara testified she and Terry decided to take placement of the children and have had them since that time.

Tara testified that when the children first came to live with them, the children were exhibiting behavioral issues and started therapy. Tara testified that therapy had addressed those issues and that the issues no longer existed. All three children are attending school and doing very well. Tara explained that she has continually taken steps with the children to expose them to Native American culture by taking them to powwows, to visit the Rosebud Indian reservation, and to the Crazy Horse monument in South Dakota and by frequently checking out books on the subject from the library. Tara testified that the children are settled in their home and are all bonded with her and Terry.

*Trial Court's Order.*

On June 18, 2014, the trial court overruled the Tribe's motion to change placement, finding the State had met its burden of proof in showing that there was good cause to deviate from the placement requirements of the federal Indian Child Welfare Act (ICWA) and that the best interests of the children indicate that a change of placement was not appropriate. The court noted that the children had been placed in their current foster placement for more than 3 years and that the placement initially was made at Ida's request. Further, the court noted that DHHS initiated multiple home studies on Brianna, none of which led to her being approved as a placement, and that the evidence indicated that some of the concerns raised over Brianna's ability to be a proper placement for the children had not been alleviated over time; and, more importantly, that the best interests of the children would be adversely affected by their being moved. The court also noted the evidence indicated that DHHS exercised due diligence in trying to find alternative family placements, but that these placements were rejected by the family members who were contacted and that DHHS was advised by the Tribe there were no tribal placements available. It is from this order that the Tribe has appealed.

## ASSIGNMENTS OF ERROR

The Tribe contends that the trial court erred (1) in holding that the State had met its burden of proof that good cause existed to deviate from the placement preferences and (2) in finding that DHHS had exercised due diligence in trying to accomplish compliance with the ICWA.

## STANDARD OF REVIEW

[1,2] An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). An appellate court reviews questions of law independently of the juvenile court's conclusions. *Id.*

## ANALYSIS

*Denial of Tribe's Motion
to Change Placement.*

The Tribe contends that the trial court abused its discretion when it determined that a change of placement of the three minor children would not be in the best interests of the children because they had been in the same placement for 3 years and when it relied upon testimony from DHHS' qualified expert witness, Eveleth, in holding that such a change would be likely to cause serious emotional damage to the children. The Tribe also argues that the trial court erred when it ignored the testimony of Turgeon and the Tribe's home study, which found that placement with Brianna would be appropriate.

The NICWA's Neb. Rev. Stat. § 43-1508(2) (Reissue 2008), which is the equivalent to the ICWA's 25 U.S.C. § 1915(b) (2012), provides:

> Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his or her special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, *in the absence of good cause to the contrary*, to a placement with:
>
>    (a) A member of the Indian child's extended family;
>
>    (b) A foster home licensed, approved, or specified by the Indian child's tribe;
>
>    (c) An Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
>
>    (d) An institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

(Emphasis supplied.)

In the case of *In re Interest of Bird Head*, 213 Neb. 741, 331 N.W.2d 785 (1983), the Nebraska Supreme Court considered whether good cause had been shown to deviate from the placement preferences specified in the ICWA. In that case, the Indian child's mother was deceased and the father was

unknown. The trial court terminated the parental rights of any potential father, ordered that the child's custody remain with DHHS and that the child be placed for adoption, and continued temporary custody with the child's foster parents pending further disposition by DHHS. The child's maternal aunt appealed, alleging, among other things, that the court erred in failing to follow the placement preferences outlined in the ICWA or to make any findings of good cause for not doing so. The record in that case showed that there were several possible placements for the child which had statutory preference over placement with the current foster parents, who had no statutory claim of preference. Although the evidence showed that the foster parents were fit and proper persons to have custody, the lower court made no finding to that effect; nor did it make a finding about the fitness of the foster parents as compared to that of the statutorily preferred individuals.

On appeal, the Nebraska Supreme Court noted that the ICWA did not strictly require placement with a statutorily preferred person or agency, but, rather, required only that the statutory preferences be followed in the absence of good cause to the contrary. The court observed that the only direct finding made by the lower court was that the child's aunt was unfit to have custody of the child, a finding that was supported by the evidence. However, the court observed that the evidence was uncertain and that no finding had been made below as to good cause for failing to follow the statutory preferences with respect to the other preferred individuals or agencies. The court observed that the ICWA "does not change the cardinal rule that the best interests of the child are paramount, although it may alter its focus." *In re Interest of Bird Head*, 213 Neb. at 750, 331 N.W.2d at 791. The court further stated that the legislative history of the ICWA showed that its "good cause" provision was intended to provide state courts with flexibility in determining the placement of Indian children. The court held that under the ICWA, factual support must exist in the trial record for the purpose of appropriate appellate review as to good cause for failure to comply with statutory child placement preference directives. See *In re Interest of Bird Head, supra*. Because the record lacked any findings by the lower

court as to what good cause was shown for deviation from the placement preferences with respect to persons other than the child's aunt, the court remanded the cause for consideration of whether good cause existed not to place the child with other family or tribal members. *Id.*

Neither the ICWA nor the NICWA defines what constitutes good cause for deviating from the statutory placement preferences; however, the Bureau of Indian Affairs has published nonbinding guidelines for determining whether good cause exists. We have previously looked to such guidelines for reference in NICWA cases concerning issues other than those present in this case. See, generally, *In re Interest of Enrique P. et al.*, 19 Neb. App. 778, 813 N.W.2d 513 (2012); *In re Interest of Melaya F. & Melysse F.*, 19 Neb. App. 235, 810 N.W.2d 429 (2011); *In re Interest of Ramon N.*, 18 Neb. App. 574, 789 N.W.2d 272 (2010). The Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,594 (Nov. 26, 1979) (not codified), state, under subdivision (a) of paragraph F.3, "Good Cause To Modify Preferences," that for purposes of foster care or preadoptive or adoptive placement, a determination of good cause not to follow the order of preference in the ICWA shall be based on one or more of the following considerations:

> (i) The request of the biological parents or the child when the child is of sufficient age.
>
> (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.
>
> (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.

Those guidelines further state that the burden of establishing the existence of good cause not to follow the statutory preferences is on the party urging that the preferences not be followed. The commentary section following the above guidelines states that paragraph (iii) of the guidelines quoted above recommends that a diligent attempt to find a suitable family meeting the preference criteria be made before consideration of a nonpreference placement is considered. A diligent

attempt to find a suitable family includes, at a minimum, contact with the child's tribal social service program, a search of all county or state listings of available Indian homes, and contact with nationally known Indian programs with available placement resources. *Id*. at 67,595.

In this case, the trial court's order found that the State had met its burden of proof by showing good cause to deviate from the placement requirements of the ICWA. The court found that even though Brianna met the requirements of being a member of the child's extended family and of her home's being a foster home approved by the Tribe, the best interests of the children indicated that a change of placement was not appropriate and would adversely affect the children. The court found that the children had been placed in their current foster home for more than 3 years, which placement was made at Ida's request. The court further found that while Brianna had made some steps toward being an appropriate placement, there still remained concerns about her ability which had not been alleviated. Clearly, the trial court's determination as to good cause was based on the appropriate determinations.

Upon our de novo review of the record, we conclude that the record supports the finding that the State has shown good cause to deviate from the statutory preferences of the ICWA. The record indicates that at the inception of this case, Ida requested that the children be placed with Tara and Terry. Over the next 3 years, DHHS made attempts to find a suitable family by maintaining contact with the Tribe and contacting family members. The record indicates that DHHS was continually informed by the Tribe that there were no Native American homes available for placement in the area or on the reservation. Throughout the proceedings, family members indicated that they might be interested in placement, but most lost interest and contact with DHHS. Brianna was the only family member who maintained an interest in placement, but was continually found by DHHS to be unsuitable for placement. Furthermore, the testimony from the experts for both the State and the Tribe, the caseworkers, and various other witnesses clearly indicates that a change in placement at this time would be emotionally detrimental and would adversely affect the

children, who are flourishing in their current placement, where they have been for over 3 years. The children are thriving at school and are active and social, and the need for any therapy to address behavioral issues had completely ceased.

The ICWA does not require strict placement, only that statutory preferences be allowed in the absence of good cause to the contrary. Further, the ICWA does not change the long-standing precedent that the best interests of the children are paramount. Good cause has been shown, and the denial of placement with Brianna at this time is in the best interests of the children.

*Due Diligence in Finding Placement.*

The Tribe next assigns that the trial court erred in finding that DHHS had exercised due diligence in compliance with the ICWA, because it did nothing more than complete three home studies of Brianna and was hostile in denying visitation between the children and relatives. The Tribe argues that DHHS did not make active efforts to prevent the breakup of the Native American family.

[3,4] Generally stated, the substantive portions of the ICWA and the corresponding portions of the NICWA provide heightened protection to the rights of Indian parents, tribes, and children in proceedings involving custody, termination, and adoption. *In re Adoption of Kenten H.*, 272 Neb. 846, 725 N.W.2d 548 (2007). Included in this heightened protection is the active efforts reunification standard found in Neb. Rev. Stat. § 43-1505(4) (Reissue 2008):

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under state law shall satisfy the court that active efforts have been made to provide remedial services and reha-bilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

Referring to the Nebraska Administrative Code, the Nebraska Supreme Court has stated: "[T]he 'active efforts' standard requires more than the 'reasonable efforts' standard that applies in non-ICWA cases. And at least some efforts should

be 'culturally relevant.' Even with these guidelines, there is no precise formula for 'active efforts.' Instead, the standard requires a case-by-case analysis." *In re Interest of Walter W.*, 274 Neb. 859, 865, 744 N.W.2d 55, 61 (2008). In adjudication cases, the standard of proof for the active efforts element in § 43-1505(4) is proof by a preponderance of the evidence. *In re Interest of Mischa S*., 22 Neb. App. 105, 847 N.W.2d 749 (2014).

Based upon the record before this court, the procedural posture of this case is unique. The case was previously before the court on appeal regarding the voluntary relinquishment and termination of both parents' rights. See *In re Interest of Nery V. et al*., 20 Neb. App. 798, 832 N.W.2d 909 (2013). In that case, we affirmed Ida's voluntary relinquishment of her rights to Mario Jr. and Esperanza, remanded the cause for further proceedings to be conducted after proper notice was given to the Tribe, and vacated the order terminating the rights of the biological father, Mario V., Sr., to all three children. *Id*.

The present case on appeal deals not with termination of any parental rights, but with a change in placement. Initial placement of the children was done in 2010, with the consent of Ida and with no objection from the Tribe until 2013. Thus, the case is still in the adjudication stages and the State must prove active efforts not by the clear and convincing standard of termination cases, but by a preponderance of the evidence. See *In re Interest of Mischa S., supra*.

The Tribe asserts that this case is akin to *In re Interest of Bird Head*, 213 Neb. 741, 331 N.W.2d 785 (1983). We disagree and find the current circumstances distinguishable. We have addressed *In re Interest of Bird Head* in great detail in the previous section of our analysis and will not set out that information as duplicative. It is clear that the record in *In re Interest of Bird Head* completely lacked any findings by the juvenile court, including as to what efforts had been made by DHHS and whether the children's current placement met any of the statutory claims of preference. The decision was reversed and the cause remanded for further proceedings because the placement was not supported by good cause, not because DHHS had not exercised due diligence.

In the present case, the trial court found that DHHS had exercised due diligence in trying to find alternative family placements but, until recently, was rejected by family members and had been continually advised by the Tribe that no tribal placements were available. It was not until October 2013 that the Tribe indicated it had appropriate placement options for the children and that Ida indicated she no longer wished to have the children placed with Tara and Terry after initially requesting that they be placed there in 2010.

The NICWA expert for DHHS, Eveleth, testified that in this case, family was first considered for placement of the children. At one point, the children were placed with a family member, and also, several family members such as a maternal great aunt and a grandmother had been considered for placement but eventually indicated to DHHS that they were not interested or lost contact with DHHS completely. The first caseworker on the case, Ledesma, contacted several family members regarding placement, including one who did not complete a home study, one who was denied after a home study, and one who declined to be considered for placement of the children. Ledesma and Eveleth also maintained contact with Bad Wound, the Tribe's ICWA expert, about the children via telephone and in-person contacts. Eveleth testified that she specifically talked with Bad Wound about placement with Native American families but was informed that there were no families available for placement in the area or on the Rosebud Sioux reservation. Eveleth also testified that she was told that the Tribe had no family or tribal services available for the family. DHHS sought out a therapist who had experience with Native American heritage and had actually provided services on the Rosebud Sioux reservation. DHHS also attempted to form a cultural plan, but was informed by the Tribe that it was too early for the formation of a cultural plan.

Eveleth testified that there had been repeated contact with Bad Wound which had been documented and that the appropriate notices had been sent to the Tribe. Eveleth explained that initially, the children were not eligible for membership in the Tribe during the children's first contact with DHHS, but DHHS continued to contact the Tribe thereafter and the

children were eventually eligible. The record shows that Tara and Terry are fostering the children's Native American culture by taking them to powwows, visiting the Rosebud Indian reservation, taking a trip to the Crazy Horse monument in South Dakota, and frequently checking out books on the subject from the library. These, based upon Brianna's testimony, are significantly more efforts than she provides her biological daughter. Brianna testified that she has her federal identification card from the Lakota Sioux Tribe and that she took her daughter to a Tribe powwow in 2013. Other than those two instances, Brianna testified she had very little involvement with the Tribe, limited to talking to her daughter about her ancestors and buying a compact disc of "Indian music" to listen to. Therefore, the record supports by a preponderance of the evidence that DHHS made active efforts in this case.

However, we shall not go without mentioning that the record has presented concern that these active efforts may not survive a test under the clear and convincing standard in possible future proceedings, given that the record indicates that Brianna and other family members have requested visitation with the children and had been denied and given that there is no evidence of services offered by DHHS in light of those relationships. As the case continues to proceed, DHHS should be mindful of its heightened obligation to foster Native American relationships.

## CONCLUSION

In conclusion, we find that good cause exists for a deviation from statutory placement preferences under the ICWA and that the trial court did not err by denying the Tribe's motion to change placement. Further, the record supports a showing by a preponderance of the evidence that active efforts were made by DHHS to prevent the breakup of the Native American family. Therefore, we affirm the order of the trial court.

Affirmed.